**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

MCDONALD'S CORPORATION,

                              Plaintiff,

              v.

CARGILL, INC., CARGILL MEAT SOLUTIONS
CORPORATION (a/k/a CARGILL PROTEIN), JBS S.A.,
JBS USA FOOD COMPANY, SWIFT BEEF COMPANY,
JBS PACKERLAND, INC., NATIONAL BEEF PACKING
COMPANY, TYSON FOODS, INC. and TYSON FRESH
MEATS, INC.,

                              Defendants.

---

**COMPLAINT**

**<u>JURY TRIAL DEMANDED</u>**

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THIS ACTION..................................................................................1

II.    JURISDICTION AND VENUE...........................................................................11

III.   PARTIES...............................................................................................................12

     A.     Plaintiff .......................................................................................................12

     B.     Defendants...................................................................................................13

     C.     Defendants and Their Subsidiaries and Affiliates .................................17

     D.     Defendants' Co-Conspirators....................................................................17

     E.     Reciprocal Agency of Defendants and Co-Conspirators......................18

     F.     Defendant Parent and Subsidiary Companies Share a Unity of Interest..............18

IV.    INDUSTRY BACKGROUND..............................................................................25

V.     DEFENDANTS' ANTITRUST VIOLATIONS..................................................29

     A.     Direct Evidence of Defendants' Conspiracy.........................................30

     B.     The Available Data Corroborates Witness 1's Account......................36

     C.     Operating Defendants Slash Production in 2015 ..................................42

     D.     Operating Defendants Continued to Artificially Limit Supply in 2016..............47

     E.     After Historic Cuts, Operating Defendants Continued Restraining the Supply of Beef, Resulting in Higher Beef Prices in 2017 and 2018 ...................49

     F.     In 2019 and 2020, Operating Defendants Continued to Limit Slaughter, in Parallel, Against Their Independent Self-Interest................................51

     G.     Defendants Idled and Closed Plants, and Refrained From Expanding Processing Capacity .................................................................54

     H.     Parallel Reductions in Cash Cattle Purchases and Anticompetitive Queuing Conventions .................................................................56

VI.    EFFECTS OF DEFENDANTS' ANTITRUST VIOLATIONS .....................58

     A.     Defendants' Conspiracy Increased the Spread between Cattle and Beef Prices .................................................................58

     B.     Tyson Foods and, Jointly, JBS S.A. and JBS USA Falsely Claimed Their Record Profits Were Due to Market Prescience, Not Supply Constraints ...........61

VII.   ADDITIONAL PLUS FACTORS SUPPORTING THE REASONABLE INFERENCE OF DEFENDANTS' CONSPIRACY .....................................62

A.      Operating Defendants Signaled Their Conspiracy and Encouraged Each Other to Maintain the Conspiracy ........................................................ 62

B.      The Beef Market is Highly Concentrated ........................................... 64

C.      The Beef Market Has High Barriers to Entry .................................... 65

D.      Beef is a Commodity Product ............................................................ 66

E.      The Demand for Beef is Inelastic ...................................................... 67

F.      Defendants Had Multiple Opportunities to Collude ........................... 68

G.      Defendants Exacerbated Their Supply Restraints by Continuing to Reduce Their Imports .................................................................................. 73

H.      Defendants' Market Share Stability is Indicative of a Conspiracy ...... 74

I.      The Production Cuts Were Implemented Despite Surging Beef Demand .......... 75

VIII.    THE BEEF INDUSTRY FACES GOVERNMENTAL INQUIRIES AND INVESTIGATIONS ....................................................................................... 77

IX.     ANTITRUST INJURY ................................................................................. 79

X.      DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY ............. 81

B.      Plaintiff's Claims are Timely .............................................................. 88

C.      Plaintiff Exercised Due Diligence in Attempting to Discover their Claim ........... 89

XI.     DEFENDANTS ENGAGED IN CONTINUING ANTITRUST VIOLATIONS .......... 90

A.      Defendants Inflicted New and Accumulating Injury on Plaintiff ........ 91

XII.     VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1 ................. 93

XIII.    REQUEST FOR RELIEF ............................................................................. 96

XIV.    JURY TRIAL DEMANDED ......................................................................... 97

Plaintiff McDonald's Corporation ("Plaintiff" or "McDonald's") brings this action against Defendants Cargill, Inc., Cargill Meat Solutions Corporations (a/k/a Cargill Protein) ("CMS"), JBS S.A., JBS USA Food Company ("JBS USA"), Swift Beef Company ("Swift"), JBS Packerland, Inc. ("Packerland"), National Beef Packing Company ("National Beef"), Tyson Foods, Inc. ("Tyson Foods"), Tyson Fresh Meats, Inc. ("Tyson Fresh") (collectively "Defendants"), and unnamed co-conspirators, and for its Complaint against Defendants, Plaintiff alleges as follows:

## I.      NATURE OF THIS ACTION

1.      As alleged more fully below, beginning at a time uncertain, but at least as early as approximately January 1, 2015, and continuing through the present and with an effect thereafter, Defendants and their co-conspirators engaged in a contract, combination or conspiracy in restraint of trade or commerce in violation of Section One of the Sherman Act. The goal of their conspiracy was to fix, raise, stabilize and/or maintain the price of beef[1] sold to Plaintiff and others at supra-competitive levels – that is, prices artificially higher than beef prices would have been in the absence of their conspiracy.  Defendants' conspiracy was effective and achieved that goal. Ascertaining the full scope and measure of the conspiracy will require discovery.  However, as alleged in this Complaint, Defendants and their co-conspirators implemented their conspiracy through one or more anticompetitive means.  For example, and without limitation, they implemented their conspiracy by coordinating, manipulating, or agreeing to pay less than competitive prices for the main or primary input in producing beef, namely, slaughter-ready cattle

---

[1]      In this Complaint, "beef" includes boxed and case-ready meat processed by Defendants and other smaller, non-Defendant producers from fed cattle, including primal cuts, trim or sub-primal products, further-processed and value-added products, offal or variety products, and rendered products and by products.  "Beef" also includes ground beef to the extent that it is processed, in whole or in part, from fed cattle.  "Fed cattle" means steers and heifers raised in feedlots on concentrated diets to be produced and sold as beef.

(*i.e.*, fed cattle), for the purpose and with the effect of fixing, increasing, stabilizing or maintaining above competitive levels their margins on, and the price of beef sold to, Plaintiff and others. Additionally, or in the alternative, as a further example, Defendants and their co-conspirators implemented their conspiracy by collusively reducing the slaughter-ready cattle and beef supply, which over time artificially elevated the price of beef that they sold to Plaintiff and others.

2.      Plaintiff, through its assignors, purchased beef in the United States directly from one or more of the Defendants and co-conspirators, from at least January 1, 2015, until the present (the "Conspiracy Period").

3.      Defendants are the world's largest meat processing and packing companies, known in the industry as meatpackers or packers. In 2018, Defendants (Tyson Fresh, CMS, Swift/Packerland, and National Beef) (collectively "Operating Defendants") sold approximately 80% of the more than 25 million pounds of fresh and frozen beef supplied to the U.S. market. Collectively, they controlled approximately 81–85% of the domestic market-ready fed cattle processed (or slaughtered) during the Conspiracy Period.[2] The next largest, non-Defendant meatpacker had only a 2–3% market share.

4.      The U.S. Department of Justice ("DOJ") and U.S. Department of Agriculture ("USDA") have launched investigations into whether Defendants fixed beef prices in the United States. In June 2020, news sources reported that the DOJ's Antitrust Division sent civil subpoenas to Defendants Tyson Foods, JBS S.A., and Cargill, Inc., and to National Beef Inc. (a company related to Defendant National Beef) seeking information relating to their pricing practices dating back to January 2015.

---

[2]     In 1977, the largest four beef-packing firms controlled just 25% of the market, compared to 85% of the market by 2018.

5.      The DOJ's investigation followed a March 12, 2020, Senate Subcommittee hearing,[3] during which Secretary of Agriculture Sonny Perdue announced that the USDA had begun an investigation into suspiciously high beef prices. Secretary Perdue expressed concern that meatpackers, such as Defendants, were paying lower prices for cattle without passing the cost savings on to beef purchasers such as Plaintiff. As he explained, the difference between prices for live cattle and prices for wholesale beef was "historically high."

6.      The Government's concern over the impact of Defendants' anticompetitive conduct in the cattle and beef market was laid bare in a June 1, 2021 letter from 26 U.S. Senators to the DOJ. In that letter, the Senators asked "the government to determine whether the stranglehold large meatpackers have over the beef processing market violates our antitrust laws and principles of fair competition." They described Defendants' actions as follows: "From our perspective, the anticompetitive practices occurring in the industry today are unambiguous and either our antitrust laws are not being enforced or they are not capable of addressing the apparent oligopoly that so plainly exists." The letter also noted that "[f]or far too long, cattle producers and consumers have been hurt by the increasing concentration of market power and anticompetitive actions of just a few meatpacking companies. Their collective power over the cattle and beef processing industry allows them to seemingly control prices at their will." The Senators requested the DOJ and the USDA to investigate potential market manipulation and other illegal activity by Defendants.

7.      Plaintiff understands from unsealed information and court filings in the litigation brought by cattle ranchers[4] that a confidential witness ("Witness 1"), who was previously

_____

[3]     The March 12, 2020, hearing was before the Senate Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies.

[4]     Plaintiff's allegations relating to Witness 1 and Witness 2 set forth in this Complaint are made upon information and belief based on allegations contained in the Third Consolidated Amended Class Action

employed by Defendant Swift at its Cactus, TX plant has confirmed the existence of a conspiracy among the Operating Defendants (the principal operating entities of Defendants, as identified in the descriptions of Defendants alleged below).

8.      Witness 1, who has been identified as Jason F., confirmed that all the Defendants agreed to reduce their cattle purchases and slaughter volumes for the purpose and effect of increasing their margins (*i.e.,* the spread between what Defendants pay cattle ranchers for fed cattle and the price they charge Plaintiff, through its assignors, and other direct purchasers for beef). Defendants' transactional data and slaughter volume records, information published by the USDA, and Defendants' public calls for industry-wide slaughter and capacity reductions, corroborate Witness 1's account of Defendants' anticompetitive agreement.

9.      In addition to the high concentration in the wholesale beef industry,[5] other structural characteristics of the domestic beef market facilitated Defendants' conspiracy. For example, Operating Defendants sit atop the supply and distribution chain that ultimately delivers beef to the market. More specifically, Defendants purchase cattle from the nation's feedlots, slaughter and pack cattle into beef, and ultimately sell beef to beef purchasers such as Plaintiff, through its assignors. Operating Defendants' have exploited their pivotal role in the process of buying cattle to produce beef to collusively control upstream cattle pricing and downstream beef pricing during the Conspiracy Period.

---

Complaint filed in the District of Minnesota and the Court's Order denying Defendants' motion to dismiss. *Ranchers Cattlemen Action Legal Fund, et al. v. Tyson Foods, et al.*, No. 19-1222, Dkt. 312 (D. Minn.); *In re Cattle Antitrust Litigation*, No. 20-cv-1319, Dkt. 238 (denying motions to dismiss, based, at least in part, on similar allegations relating to Witness 1 and 2).

[5]      According to the Senators' June 2021 letter to the DOJ, "The U.S. meatpacking industry is more consolidated today than it was in 1921 when the Packers and Stockyards Act was enacted. Four companies operate 18 of the top 20 beef slaughter facilities in this country, which constitutes 94% of this capacity."

10.     Other market characteristics serve as "plus factors" supporting the inference that Defendants conspired during the Conspiracy Period.  As explained more fully below, these characteristics include producer concentration, high barriers to entry, inelastic demand, the commodity nature of beef, frequent opportunities to conspire, strong demand, and/or market share stability. These economic factors made the market for the production and sale of beef conducive to cartelization.

11.     Defendants' increased profit margins during the Conspiracy Period were aided by the way supply and demand operate in the beef industry.  The supply of cattle is insensitive to short-term price changes because of the long lifecycle of cattle, cattle's perishable nature, and the lack of any alternative use for cattle. Beef demand is also relatively insensitive to price fluctuations. As a result, Operating Defendants' margins were (and are) very responsive to changes in the aggregate volume of slaughtered cattle.

12.     Another form of interaction conducive to Defendants' collusion was frequent meetings between each other's executives and key employees. Trade association conferences and other industry events offered convenient opportunities to exchange information, plans and strategies, and to build relationships. As described throughout this Complaint, Operating Defendants seized these opportunities to advance their collusive supply restrictions.

13.     As alleged in detail below, by at least the beginning of 2015, Defendants began exploiting favorable market conditions to launch their conspiracy. More specifically, Defendants began to coordinate on the prices they would pay for fed cattle. They also coordinated on their respective cattle slaughter volumes.  Thus, over time, the output of beef was reduced resulting in higher beef prices for purchasers like Plaintiff, through its assignors, during the Conspiracy Period. Industry data shows Operating Defendants' transition from competition to collusion by managing the price of fed cattle and the industry slaughter volumes.   Joint

management of their respective slaughter volumes during the Conspiracy Period is shown in Figure 1 below, which tracks their quarterly slaughter volumes and shows them moving in tandem.

**Figure 1**



14.     The results of Defendants' agreement to coordinate slaughter reductions and volume are illustrated in Figures 2 and 3 below. Figure 2 compares the average annual beef cattle slaughter by Operating Defendants and the smaller, non-defendant beef producers in the market before the Conspiracy Period (2007–2014) to the same average during the first five years of the Conspiracy Period (2015–2019), the years for which data is available.

**Figure 2. Average Annual Commercial Slaughter of Cattle**



15.     Figure 3 also compares the Operating Defendants' and the Independent Packers' annual slaughter volumes during the Conspiracy Period and the pre-Conspiracy Period, but breaks out the slaughter volume for each year of the Conspiracy Period for which data is available. ("Independent Packers" are packers that operate independently of and are not affiliated with Defendants.) The graph confirms that Tyson Fresh, Swift/Packerland, CMS, and National Beef each slaughtered fewer fed cattle in every year in the Conspiracy Period compared to their pre-Conspiracy Period averages. It also shows that while Tyson Fresh, Swift/Packerland, CMS, and National Beef each gradually increased its slaughter volume from 2016 after its 2015 reductions, as the supply of fed cattle increased, the rate of increase of each of these Defendants was outpaced by the slaughter volume increases of Independent Packers during the same period.[6]

---

[6]     National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume. Absent that acquisition, its year-on-year slaughter volume was flat against 2018, while Independent Packers' collective slaughter volume rose by approximately 100,000 head (netting out National Beef's acquisition of Iowa Premium).

Operating Defendants thus used periodic slaughter reductions and underutilized plant capacity to ensure their supply of beef never outstripped demand.

**Figure 3.**
**Average Pre- & Post-Conspiracy Period Fed Cattle Slaughter-Operating Defendant vs. Others**



16.   These figures demonstrate that each Operating Defendant family curtailed its annual slaughter volumes during the Conspiracy Period, while the smaller beef processors collectively increased their slaughter volumes during the same period without making up the shortfall of beef created by the conspiracy.

17.   As a consequence of Operating Defendants' reduced supply, the beef market experienced a change of price behavior. Before 2015, prices of cattle and beef predictably moved in tandem. That correlation was the result of a natural economic relationship in a competitive market because beef is simply processed cattle.

18.   But, beginning in approximately 2015, this fundamental economic relationship between cattle and beef prices changed. The degree of correlation of cattle and beef prices diverged (to Operating Defendants' benefit) without any credible, non-collusive

explanation. The relevant supply and demand factors in the industry no longer explained the prices charged to direct purchasers such as Plaintiff, through its assignors.

19.     Starting in 2015, the margins earned on beef sales sold directly to purchasers, such as Plaintiff, through its assignors, began to show trends that can now be seen as unusual. The per-pound price of cattle had historically stayed within 20 to 40 dollars of the per-pound average wholesale price of beef. However, in 2015, the spread between those prices increased significantly, as demonstrated by Figure 4 and Figure 5 below.

**Figure 4.**



## Figure 5

| Years | Farm to Wholesale Price Spread | Proportional Increase |
|---|---|---|
| 2010 - 2014 | $34.10 | |
| 2015 - 2019 | $60.20 | 77% |
| 2020 | $122.00 | 103% |
| 2021 | $156.50 | 28% |

-9-

20.     According to USDA Economic Research Service data, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 through 2021 than during the preceding five years. From 2010, to 2014, the average farm-to-wholesale spread was about $34. But from 2015 to 2021, the average spread was about $82.78—a 143% increase. The spread continued to balloon: by 2020 reaching about $71, a 109% increase from the pre-conspiracy period average.

21.     Operating Defendants' ability to reduce the prices of fed cattle over time while maintaining inflated beef prices during the Conspiracy Period provides compelling, circumstantial evidence of their conspiracy. In a competitive beef market, if a competitor reduces its price paid for fed cattle, then other competitors would be expected to increase purchases, so they could boost output and increase their profit and market shares.

22.     Only colluding meatpackers would expect to benefit by reducing their prices and purchases of slaughtered cattle because they would know that their conspiracy would shield them from the dynamics of a competitive marketplace. By collusively underpaying suppliers for fed cattle, and over time reducing beef output, Defendants have been able to increase their margins and profits, confident that none of them would take volume from each other.

23.     United by their conspiracy, Operating Defendants were confident that none of them would defect and disproportionately expand their beef production to satisfy unmet demand. Armed with this assurance, Operating Defendants achieved unprecedented meat margins (*i.e.*, the gap between what they paid for cattle and what they charged for beef sold to direct purchasers like Plaintiff, through its assignors).

24.     For example, by the end of 2021, the two largest Defendants, Tyson Foods and JBS USA, were reporting record margins or net revenue in their beef business. Tyson Foods reported that its beef business' operating margin was nearly 18% percent—nearly nine times its

2014 operating margin of 2.1%. Meanwhile, JBS USA reported net revenue of $27.18 billion in 2021, which is a 25.8% increase of the $21.6 billion of net revenue it reported for its beef operations in 2014.

25.     Given these bloated margins, it is unsurprising that a leading industry reporter remarked that Defendants "no longer compete against each other," which has enabled them to reap "gangbuster profits."[7]

26.     In summary, Defendants colluded during the Conspiracy Period to reduce supplies of beef in tandem, thereby raising and fixing beef prices at levels higher than prices that would have prevailed had the beef market been competitive. As a direct result, Plaintiff suffered antitrust injury by paying illegally inflated prices for beef it purchased from Defendants.

## II.     JURISDICTION AND VENUE

27.     Plaintiff brings this action under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to secure damages and injunctive relief for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

28.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

29.     Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c) and (d) because one or more Defendants reside in, are found in, transacted business in, or have an agent who transacted business in this District and because a substantial portion of the affected interstate commerce was carried out here.

---

[7]     Cassandra Fish, "Whatever Happened to a Fair Fight," The Beef (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/.

30.     This Court has personal jurisdiction over each of the Defendants because, among other reasons, each Defendant: (a) inhabits, transacts business in, has continued or systematic contacts with, or is found in this District; (b) has sufficient minimum contacts in the United States sufficient to satisfy due process; (c) manufactured, sold, shipped, and delivered or directed the manufacture, sale, shipment, and delivery of substantial quantities of beef throughout the United States, including in this District; (d) belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District, including, without limitation, selling beef to Plaintiff, through its assignors, and others in this District at artificially inflated prices; and/or (e) engaged in unlawful conduct that was directed at, and had a direct, substantial, foreseeable, and intended effect of causing injury to, interstate and foreign commerce and the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

## III.     PARTIES

### A.     Plaintiff

31.     Plaintiff McDonald's Corporation is a Delaware Corporation with its principal place of business in Chicago, Illinois.  Plaintiff has established a global quick-service restaurant business operating under the McDonald's brand with over 39,000 restaurants in over 100 countries, including over 13,000 in the United States. McDonald's brings this action pursuant to assignments with OSI Group, LLC, Dorada Poultry LLC, Lopez Foods, Inc., DeOro Foods LLC, The HAVI Group LP, HAVI Global Solutions, LLC, Golden State Foods Corp., Fulton Market Group, LLC and Fulton Market Group Australia Unit Trust, and their affiliates and predecessors with respect to direct purchases made in the United States for McDonald's company-owned, franchised and developmental licensee locations in the United States, U.S. territories, and Latin America. OSI Group, LLC, Dorada Poultry LLC, Lopez Foods, Inc., DeOro Foods LLC, The

HAVI Group LP, HAVI Global Solutions, LLC, Golden State Foods Corp., and Fulton Market Group, LLC on behalf of themselves and their affiliates and predecessors, have assigned federal antitrust claims based on those direct purchases to McDonald's.

32.     During the Conspiracy Period, Plaintiff, through its assignors, purchased beef at artificially inflated prices directly from one or more Defendants, and their affiliates and co-conspirators, and suffered injury to their businesses or property as a direct or proximate result of Defendants' wrongful conduct. Plaintiff has therefore suffered antitrust injury as a direct result of the antitrust violations alleged in this Complaint.

### B.     Defendants

#### 1.     The Cargill Defendants

33.     Defendant Cargill, Inc. is a privately held Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391. During the Conspiracy Period, Cargill, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through Cargill, Inc.'s wholly owned or controlled affiliates, to purchasers in the United States. Cargill, Inc. is the parent company.

34.     Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) (a/k/a Cargill Protein – North America) ("CMS") is a wholly owned Cargill, Inc. subsidiary. CMS is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202. CMS is the principal operating entity within Cargill, Inc.'s U.S. cattle and beef business and is a wholly owned subsidiary of Cargill, Inc. On information and belief, CMS owns directly, or indirectly through its subsidiaries, Cargill, Inc.'s U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

35. During the Conspiracy Period, Cargill, Inc. wholly owned, as a direct or indirect subsidiary, CMS and sold, along with CMS, beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States.

36. During the Conspiracy Period, Cargill, Inc. and CMS shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy that purposefully directed conduct causing injury to and derived direct benefit from Plaintiff in the United States and this District.

### 2. The JBS Defendants

37. Defendant JBS S.A. is a Brazilian corporation with its principal place of business at Av. Marginal Direta do Tiete, 500 Bloco 3-30 andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil. During the Conspiracy Period, JBS S.A. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through JBS S.A.'s wholly owned or controlled affiliates, to purchasers in the United States. JBS S.A. is the parent company.

38. JBS USA Food Company ("JBS USA") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. JBS USA is the principal operating entity of JBS S.A.'s U.S. cattle-and-beef business. On information and belief, it is the principal operating entity within JBS S.A.'s United States cattle and beef business and the contracting entity for certain of JBS S.A.'s purchases of fed cattle in the United States.

39. Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. Swift owns directly, or indirectly through its subsidiaries, certain of JBS S.A.'s United States fed cattle slaughter plants including the Cactus, Texas; Greeley, Colorado; Grand Island, Nebraska; and

Hyrum, Utah plants. On information and belief, Swift contracts for the majority of fed cattle to be slaughtered at these plants.

40.    Defendant JBS Packerland, Inc. ("Packerland") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634.

41.    On information and belief, Packerland owns directly, or indirectly through its subsidiaries, certain of JBS S.A.'s United States fed and dairy cattle slaughter plants, including the Packerland packing plants in Green Bay, Wisconsin and Plainwell, Michigan, the Sun Land beef plant in Tolleson, Arizona, and the Moyer Packing plant in Souderton, Pennsylvania. On information and belief, Packerland contracts for the majority of fed cattle to be slaughtered at these plants. Packerland operates a Regional Beef business unit.

42.    Various senior staff and executives responsible for the operation of JBS S.A.'s United States fed cattle and beef business during the Conspiracy Period were employed by each of JBS USA, Swift, and Packerland.[8]

43.    Throughout the Conspiracy Period, the JBS Defendants sold beef in interstate commerce, directly or through wholly owned or controlled affiliates, to purchasers in the United States.

44.    During the Conspiracy Period, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy alleged in this Complaint that purposefully directed conduct causing injury to and derived direct benefit from Plaintiff in the United States and in this District.

---

[8]    *See* JBS USA's, Swift's, and Packerland's September 25, 2020 Updated Disclosures Pursuant to Attachment 1 of ECF No. 187 in *Peterson, et al. v. JBS USA Food Company Holdings, et al.*, Case No. 19-cv-1129, at 3-7, 12-13.

### 3.      The Tyson Defendants

45.      Tyson Foods, Inc. ("Tyson Foods") is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Conspiracy Period, Tyson Foods and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

46.      Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh" and together with Tyson Foods the "Tyson Defendants") is a wholly owned subsidiary of Tyson Foods. Tyson Fresh is a Delaware corporation with its principal place of business at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049. Tyson Fresh is the principal operating entity within Tyson Foods' U.S. cattle and beef business.

47.      On information and belief, Tyson Fresh owns directly, or indirectly through its subsidiaries, Tyson Foods' U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

48.      During the Conspiracy Period, Tyson Foods wholly owned as a direct or indirect subsidiary, Tyson Fresh and sold, along with Tyson Fresh, beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States.

49.      During the Conspiracy Period, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy alleged in this complaint that purposefully directed conduct causing injury to and derived direct benefit from Plaintiff in the United States and in this District.

### 4.      National Beef Packing Company

50.      National Beef Packing Company LLC ("National Beef") is a privately owned Delaware limited liability company with its principal place of business located at 12200

North Ambassador Drive, Suite 500, Kansas City, Missouri 64163. National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

51.     On information and belief, National Beef owns directly, or indirectly through its subsidiaries, National Beef's U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

### C.     Defendants and Their Subsidiaries and Affiliates

52.     "Defendants" includes all Defendants' predecessors, including beef meatpackers merged with or acquired by any Defendant and each Defendant's wholly owned or controlled subsidiaries or affiliates that sold beef in interstate commerce directly to purchasers in the United States during the Conspiracy Period.

53.     Each of the Defendants sold or distributed beef to direct purchasers or played a material role in the coordinated and collusive behavior alleged. All Defendants were active, knowing participants in the conspiracy alleged, and their conduct, to the extent committed by the Operating Defendants, was known to and approved by their parent Defendants.

### D.     Defendants' Co-Conspirators

54.     Unknown persons, firms, and entities not named as Defendants in this Complaint participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, regardless of whether or not Plaintiff has named these co-conspirators as defendants.

E.      **Reciprocal Agency of Defendants and Co-Conspirators**

55.     Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the company's business or affairs.

56.     Each Defendant and co-conspirator acted as the agent or joint-venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct Plaintiff alleges in this Complaint.

F.      **Defendant Parent and Subsidiary Companies Share a Unity of Interest**

57.     During the Conspiracy Period, the coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise for purposes of Section 1 of the Sherman Act.

58.     A parent and its wholly owned subsidiary have a complete unity of interest and purpose. Their objectives are common, not disparate, and their general corporate actions are guided or determined not by two, separate corporate consciousnesses, but by one. Accordingly, the coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise.

59.     A parent and its wholly owned subsidiary always have a unity of purpose and thus act as a single enterprise whenever they engage in coordinated activity.

60.     By controlling, dictating, or encouraging their subsidiaries' anticompetitive conduct in advancement of a common scheme for an illegal and anticompetitive purpose, the parent Defendants independently participated in the illegal enterprise that they entered with their subsidiaries. In doing so, the parent Defendants engaged in sufficient independent participation in the conspiracy and had sufficient knowledge, intent, and involvement in Operating Defendants' conspiracy to be liable under the Sherman Act as a single enterprise with their subsidiaries.

61.     During the Conspiracy Period, the parent Defendants shared a unity of corporate interest and operated as part of a single enterprise with their subsidiaries, the Operating Defendants, to advance their conspiracy.

### 1.     The Cargill Defendants

62.     Rather than owning and operating subsidiaries to diversify risk and earn profits by investing in them, Cargill, Inc. formed subsidiaries to conduct business that it otherwise would have conducted itself. To this end, Cargill, Inc. created CMS to conduct its business in the meat industry that Cargill, Inc. previously operated itself.

63.     Cargill, Inc. presents itself and its subsidiaries to the public as a single unified enterprise. For example, in its Letter to Stakeholders included in Cargill's 2021 Annual Report, it explains, in a section entitled "How we work," that "[o]ur integrated operating approach enables our businesses to provide industry-leading products and services in their specific sections while also drawing on the full work of Cargill's expertise." Additionally, on its website, Cargill, Inc. reports that it employs 155,000 workers in 70 countries. Plaintiff is informed and therefore believes and alleges that these numbers include CMS employees. Cargill, Inc. has also publicly announced consolidated revenues, earnings, and cash flow that Plaintiff believes include performance results from CMS's beef operations.

64.     In the Letter to Stakeholders included in Cargill, Inc.'s 2019 Annual Report, Cargill, Inc. reported that it "delivered $2.82 billion in adjusted operating earnings in fiscal 2019. Revenues dipped 1% to $113.5 billion. Cash flow from operations totaled $5.19 billion." On information and belief, those statistics include earnings, revenues, and cash flows from all Cargill, Inc. subsidiaries as well as Cargill, Inc. itself. In the same document, Cargill, Inc. reported that its "[e]arnings were led by our North American protein businesses. With steady domestic and export

demand, and plentiful cattle supplies, the beef business posted its third consecutive year of strong performance."

65.     A single unified system processes both companies' purchase orders, which further demonstrates the relationship between Cargill, Inc. and CMS.

66.     Further, Cargill, Inc. operates other business services, including information technology, human resources, finance, transportation and logistics, and procurement, with and for CMS.

67.     Cargill, Inc. plays an active role in managing CMS's business operations. For example, Cargill, Inc.'s 2021 Annual Report states that its Executive Team is responsible for the company's "strategic direction, talent development and overall financial performance" and that it is "[l]ed by Board chairman and CEO, David MacLennan..."

68.     As another example, Cargill, Inc. describes the responsibilities of executive team member, Brian Sikes, as including "leading Cargill's global protein and salt businesses," overseeing "Cargill's protein business in North America and Europe," and leading "the transformation of the North American protein business." Mr. Sikes lives in Wichita, Kansas, the principal place of business of CMS.

69.     Further, Cargill, Inc.'s slaughter plants in Fresno, California, Wyalusing, Pennsylvania, and Friona, Texas all list either "Cargill" or "Cargill Beef" as d/b/a's with the USDA Food Safety Inspection Service.

70.     Cargill, Inc.'s extensive involvement in CMS's management and operations demonstrates these entities' unity of purpose (*e.g.,* to profit from their price fixing) and common objectives. Cargill, Inc.'s extensive involvement in CMS's management and operations demonstrates that Cargill, Inc. does far more than provide long-term strategy or guidance to CMS. Cargill, Inc. created CMS as its instrumentality to execute Cargill, Inc.'s directives. Throughout

the Conspiracy Period, Cargill, Inc. exerted, and had the right to exert, control over CMS. In this manner, Cargill, Inc. independently participated in the illegal enterprise with CMS and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with CMS as a single enterprise.

### 2. The JBS Defendants

71.     JBS S.A. is not merely a holding company whose business is restricted to investments in operating subsidiaries. JBS S.A. established or acquired subsidiaries, including JBS USA (which it formed), Swift (which it acquired), and Packerland (which it acquired), to conduct its business, including the purchase and processing of cattle and the sale of beef. Had JBS S.A. not created or acquired these subsidiaries, it would have performed these functions itself.

72.     JBS S.A. presents itself as a unified enterprise and conducts consolidated earnings calls on which its corporate representatives discuss the operations and profits of JBS S.A., including JBS USA, Swift, and Packerland. On these calls, JBS S.A. executives have described the beef business it conducts through JBS USA, which it refers to as "JBS beef," as a "division" or "business unit." JBS S.A. states on its website that it "produces and sells beef through two Business Units: Friboi, in Brazil, and JBS USA Beef." As reported on JBS USA's financial statements, JBS USA "conducts its United States beef and pork processing businesses through its wholly-owned subsidiaries Swift Beef Company ('Swift Beef'), Swift Pork Company ('Swift Pork') and JBS Packerland, Inc."

73.     During the Conspiracy Period, JBS USA's CEO and President reported directly to JBS S.A.'s President, Chief Executive of Global Operations, and CEO.

74.     Operating Defendants Swift and Packerland are fully integrated into the JBS USA enterprise. They rest under the complete control of JBS USA, and in turn, JBS S.A. JBS USA directs and oversees all JBS's U.S. cattle procurement, beef processing, and sales operations, with

ultimate direction from JBS S.A. JBS USA's financial statements are replete with references to notes, loans, and credit facilities that "are guaranteed by our Parent, JBS S.A."

75.   The career progression of Wesley Batista Filho clearly demonstrates the level of control JBS S.A. maintains over its subsidiaries, as JBS S.A. installed Wesley Batista Filho into whatever subsidiary they wished, at whatever level they wished, whenever they wished. Wesley Batista Filho is the son of former JBS S.A. CEO Wesley Batista, and the grandson of founder Jose Batista Sabrinho. Wesley Batista Filho's grooming to become the next Batista to lead JBS S.A. began with a position as a trainee in the JBS USA beef plant in Greeley, Colorado. He then returned to Brazil, where he worked for JBS S.A. in a variety of roles. Soon after, he became Head of JBS Uruguay, and then Head of JBS Paraguay. He was next installed as Head of JBS Canada. After that, he was made Head of Fed Beef for JBS USA and President of JBS USA and Swift Beef. Now, he is president of all JBS operations in South America.

76.   Credit rating agencies have also factored in rating JBS USA in connection with issuance of notes guaranteed by JBS USA's parent, JBS S.A. For example, credit rating agency Moody's recently reported that JBS USA was a co-issuer (along with two other JBS related entities) of proposed $500 million senior unsecured 10-year notes to be guaranteed by the parent, JBS S.A.

77.   Swift's and JBS Packerland's packing operations are presented as those of JBS USA. For example, they appear on USDA's list of Bonded Packers as "JBS USA Food Company, Swift Beef Company" and "JBS USA Food Company, JBS Packerland, Inc.," respectively. The USDA's Food Safety and Inspection Service's Inspection Directory lists "JBS," "JBS USA," and "JBS USA Food Company" among other d/b/a's for Swift.

78.   JBS S.A.'s extensive involvement in JBS USA's, Swift's, and Packerland's management and operations demonstrates these entities' unity of purpose (*e.g.,* to profit from their

price fixing) and common objectives. JBS S.A.'s extensive involvement in JBS USA's, Swift's, and Packerland's management and operations also reveals that these entities' general corporate actions are guided and determined by one corporate consciousness. JBS S.A. does more than provide long-term strategy and guidance to JBS USA, Swift, and Packerland. The entire purpose of these subsidiaries is to serve as instrumentalities by executing JBS S.A.'s directives within the greater JBS enterprise. Throughout the Conspiracy Period, JBS S.A. exerted, and had the right to exert, total control over JBS USA, Swift, and Packerland. In this manner, JBS S.A. independently participated in the illegal enterprise with JBS USA's, Swift's, and Packerland's and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with JBS USA's, Swift's, and Packerland's as a single enterprise.

### 3.    The Tyson Defendants

79.    Tyson Foods is not a mere holding company whose business is restricted to investments in operating subsidiaries. Rather, Tyson Foods formed subsidiaries to act as its agents and representatives to conduct business activities that Tyson Foods otherwise would have conducted. With respect to Tyson Foods' subsidiary Tyson Fresh, those activities include purchasing and processing cattle and selling beef.

80.    Tyson Foods holds itself out to the public as a single unified enterprise, describing the beef business it conducts through Tyson Fresh as a mere "business unit." Indeed, before Noel White became Tyson Foods' CEO (now former CEO), he was "group president of Tyson's Fresh Meats business unit."

81.    On its quarterly earnings calls, Tyson Foods' corporate representatives include Tyson Fresh when discussing the company's financial performance. On these calls, Tyson Foods announces operating income and returns on sales from its beef segment business that Tyson

Fresh operates. More specifically, on these calls Tyson Foods attributes improved returns to actions taken at plants that Tyson Fresh owns and operates.

82. During a January 31, 2014 earnings call, Tyson Foods management employees explained to investors that Tyson Foods had generated $58 million in operating income and a 1.6% return on sales from its beef segment business, despite that business being operated directly by Tyson Fresh Meats. On the same call, Tyson Foods' managers stated that "as the calf crop declines . . . we'll probably have to curtail production." Production of the beef from the calf crop is an activity undertaken by Tyson Fresh.

83. On other earning calls, Tyson Foods has described actions taken by Tyson Fresh to advance Defendants' conspiracy. For example, on its August 3, 2015, earnings call, Tyson Foods explained its strategy for cattle purchasing implemented by Tyson Fresh as "we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs."

84. Similarly, on Tyson Foods' May 7, 2018, earnings call, with respect to beef production plants owned and operated by Tyson Fresh, Tyson Foods explained that "[w]e had to stop production[], [w]e had to close plants several times in the quarter, not every plant, but several plants several times in the quarter."

85. Tyson Foods and Tyson Fresh also guarantee each other's debts. Tyson Fresh has issued multiple debt securities guaranteed by Tyson Foods. In a registration statement filed with the SEC in 2009, Tyson Foods notified investors that Tyson Fresh pledged not only its own assets to guarantee debt instruments but also those of Tyson Foods and certain "other domestic operation subsidiaries of Tyson [Foods]."

86.     Similarly, in a 2014 prospectus filed with the SEC, Tyson Foods stated that Tyson Fresh would act as a guarantor of Tyson Foods' debt securities, including debentures, notes, and all other types of debt. Tyson Foods has issued multiple senior notes under this arrangement.

87.     Finally, in registrations with the USDA's Food Safety Inspection Service, Tyson Fresh slaughter plants in Dakota City, Nebraska, Lexington, Nebraska, and Amarillo, Texas, identify Tyson Foods as a business name of Tyson Fresh.

88.     Tyson Foods' extensive involvement in Tyson Fresh's management and operations demonstrates these entities' unity of purpose (*e.g.,* to profit from their price fixing) and common objectives. Tyson Foods' extensive involvement in Tyson Fresh's management and operations also reveals that these entities' general corporate actions are guided and determined by one corporate consciousness. Tyson Foods does not merely provide long-term strategy and guidance to Tyson Fresh. Tyson Fresh's entire purpose is to execute Tyson Foods' directives within the greater Tyson enterprise and to serve as an instrumentality of Tyson Foods. Throughout the Conspiracy Period, Tyson Foods exerted, and had the right to exert, control over Tyson Fresh. In this manner, Tyson Foods independently participated in the illegal enterprise with Tyson Fresh and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with Tyson Fresh as a single enterprise.

## IV.     INDUSTRY BACKGROUND

89.     The market for fed cattle in the United States is substantial. In 2017 alone, for example, 25.8 million fed cattle were slaughtered and processed into beef products, which accounted for 80% of the 32.2 million commercial cattle slaughtered across the United States.[9]

---

[9]     The non-fed volume is comprised of slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products.

90.     The size of cattle herds in the United States is influenced by what is known as the "cattle cycle," which is a process in which the size of the national cattle herd increases and decreases over time.  Variation in herd size is often caused by the lengthy gestation period of cattle relative to hogs and poultry, which constrains cattle producers' response to profit fluctuations.   In general, the cattle cycle is determined by the combined effects of cattle prices, the gestation period, the time needed for raising calves to market weight, and climatic conditions.   If cattle producers expect the price of cattle to be high, they slowly build up their herd sizes, but if they expect prices to be low, they will reduce their herds by culling older cows and keeping fewer heifers.

91.     Production of cattle raised for beef takes considerable time and investment. The cattle production cycle, running from birth to slaughter, typically ranges between 15 to 24 months, and is the longest of all animals typically raised for meat.  Fed cattle progress through three interrelated stages prior to slaughter: cow/calf; stocking and background; and feedlots, as detailed in Figure 6 below.

**Figure 6.**



Source: GAO analysis of U.S. Department of Agriculture and industry information. | GAO-18-296

92.     The life cycle of cattle raised for beef is longer than that of any other animal commonly raised for meat. As Figure 6 illustrates, the beef value chain comprises several stages. Calves are first raised by their mothers for about six months. When they weigh about 500 pounds, the calves are weaned and sold to the stocker-yearling sector, where they eat a diet of forage, wheat pasture, and sileage. When a steer or heifer reaches 600–800 pounds, it is sold to a feedlot, where it eats corn and protein supplements in addition to roughage.

93.     Once cattle reach approximately 1,200–1,400 pounds, they are sold as fed cattle to the beef producers/packers, including Defendants. Defendants and other beef producers/packers then slaughter and process the cattle into edible boxed beef and primal and

smaller case-ready consumer cuts. A steer weighing 1,200 pounds typically yields about 490 pounds of edible beef.

94.     Cattle are sold to beef processors, including Defendants, through two channels. About 70% of cattle are sold through supply contracts (known as captive-cattle agreements) with feedlots or, to a lesser extent, ranching operations. The rest of the cattle are sold on the spot market, which is typically the benchmark for prices of cattle sold under the captive-cattle agreements. Thus, by increasing the volume of the cattle they purchased under captive-cattle agreements, and decreasing their spot purchases, Defendants, with their considerable market power, were able to depress the price they paid under both spot and captive-cattle agreements.

95.     In the final stage of the farm to market journey, Defendants and other meatpackers sell the beef to wholesalers, grocery chains, food distributors, food processors, restaurants, and other large retailers, including Plaintiff, through its assignors.

96.     On information and belief, during the Conspiracy Period, Tyson Fresh, JBS USA/Swift/Packerland, CMS, and National Beef each conduct daily meetings, typically from their head offices, attended by representatives of their respective cattle procurement, plant operations, scheduling, beef sales, and risk management teams, among others, to make decisions regarding their respective cattle and beef operations. The attendees of these meetings will discuss, among other matters, the number of cattle their fed cattle business will procure, the terms on which they would be bought, plant scheduling (including slaughter volume) across each of their slaughter facilities, and beef sales strategy.

97.     Because the cost of beef production is predominately made up of the cost of fed cattle, Defendants' profitability is driven by the "meat margin," which is the spread between the price that packers pay for fed cattle and the price they charge for beef. The meat margin is sensitive to changes in industry aggregate slaughter levels, and Tyson Fresh, Swift/Packerland,

CMS, and National Beef can (and have through collusions) increased it. As noted by the U.S. Department of Justice ("DOJ"), "[a]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits."[10]

98.     As a result of these sensitivities, during the Conspiracy Period, Tyson Fresh, Swift, Packerland, CMS, and National Beef on behalf of their respective Defendant parent companies, can (and did) improve their profitability by coordinating what they paid for slaughter-ready cattle and the resulting supply of fed cattle, at the expense of buyers of beef, including Plaintiff, through its assignors, who paid more than they would have but for Defendants' illegal conduct.

## V.     DEFENDANTS' ANTITRUST VIOLATIONS

99.     By approximately late 2014 or early 2015, Operating Defendants were experiencing shrinking profit margins on their beef sales. In earnings calls or annual reports, the two largest Defendants, Tyson Foods and JBS S.A., reported the slumping profitability of their beef operations.

100.     On a November 7, 2014, earnings call, Tyson Foods reported a quarterly operating margin for its beef division that was less than half the margin enjoyed by its poultry division.   Similarly, in its 2014 Earnings Release, JBS S.A. announced that its U.S. beef segment (JBS USA) was underperforming relative to its chicken segment (which had "performed really well in 2014") and pork segment (which in 2014 was the "best result in the pork industry in the

---

[10]     *U.S. v. JBS*, Case No. 08-cv-5992 (N.D. Ill.), ECF No. 48 ("Amended Complaint"), ¶¶ 26-27. *See also* Section VII.D. below on the elasticity of demand for beef.

US"). Its beef quarterly margin was less than one-third of its chicken segment and less than one-half of its pork segment's margin.

101.     Rather than trying to improve profitability through independent conduct pursuant to unilateral business interests, Defendants instead agreed to collectively reduce and manage their respective slaughter volumes, which, in turn, resulted in a reduction in the supply of beef. The artificial beef shortages ushered in a new era of supra-competitive prices paid by Plaintiff, through its assignors, and other direct purchasers of beef.

A.     **Direct Evidence of Defendants' Conspiracy**

102.     Information recently unsealed in public filings confirms Defendants' conspiracy, as witnessed by a former Swift employee known as Witness 1. The allegations below concerning Witness 1 are based on those filings and other recently sealed information.

103.     Based on conversations with James Hooker, head of fabrication at Swift's Cactus, Texas plant, Witness 1 states that Operating Defendants agreed with each other to periodically reduce their respective purchase and slaughter volumes, resulting in beef prices above competitive levels paid by direct purchasers like Plaintiff, through its assignors.

104.     During his decade-long employment, including several years during the Conspiracy Period, Witness 1 was a head quality assurance officer with primary responsibility for the Swift plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, *i.e.*, where head, hide, and internal organs removed. The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

105.     According to Witness 1, he learned of Operating Defendants' collusive purchase and slaughter reduction agreement from Mr. Hooker, who was employed as the head of

fabrication at the same Cactus, Texas plaint as Witness 1. As explained below, Mr. Hooker was positioned to know (and did know) about Defendants' unlawful agreement.

106.    Witness 1 regularly spoke with Mr. Hooker before starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days, which information Witness 1 and his team needed to execute their responsibilities, including the placement of his team, arrangement of hotbox and cooler space, the number of carcasses they would need to process through the hotbox and coolers that day, and his interactions with USDA inspectors.

107.    In addition to the fabrication plan, Mr. Hooker, like Witness 1, also needed to understand the number of cattle scheduled to be slaughtered each day. Among other matters, if the kill volume was lower but the price of beef remained favorable, the fabrication floor would continue to process carcasses at typical rates. However, when kill volumes were reduced and the price of beef was unfavorable, Mr. Hooker might order the carcasses to stay longer in the hotboxes and coolers before being processed into beef cuts so as to improve grading performance. In this circumstance, Witness 1 and his team would allow more space between each carcass in the hotboxes.

108.    But, if the kill volume was higher, Mr. Hooker increased the number of carcasses processed. To ensure there was sufficient space in the hotboxes and coolers, and Witness 1 spaced the carcasses closer together when filling the hotboxes. The number of carcasses expected to be put into the hotboxes also dictated the amount of air and water that Witness 1 and his team used to ensure proper cooling speeds. In sum, it was essential for both Mr. Hooker and Witness 1 to know the plant's planned slaughter figures to coordinate and perform their core job duties.

109.    Witness 1 reported having had a "decent" working relationship with Mr. Hooker.

### 1.  Mr. Hooker Was Well Positioned to Know About Operating Defendants' Unlawful Agreement

110.    On information and belief, Mr. Hooker continues to work at Swift's Cactus plant, where he has worked for over 15 years in that role, including a short stint as head of slaughter operations. Witness 1 reports that before working for Swift in the early 2000s, Mr. Hooker worked at Tyson Fresh's Amarillo, Texas slaughter plant, where he was also responsible for fabrication.

111.    As a fabrication manager for Swift, Mr. Hooker reported directly both to Cactus's General Manager, Manny Guerrero,[11] and directly to the beef production department of JBS USA/Swift/Packerland's head office in Greeley, Colorado.

112.    As head of fabrication, Mr. Hooker needed to be informed as to cattle buying/scheduling, cattle slaughter, and beef selling aspects of JBS USA/Swift/Packerland's fed cattle business. He thus interacted with personnel across JBS USA/Swift/Packerland. In particular, in addition to his direct reports, Mr. Hooker would also speak directly to other managers within the JBS corporate office about plant operations, including scheduled slaughter and fabrication volumes, and fabrication priorities.

113.    For example, during the Conspiracy Period, Mr. Hooker regularly spoke directly to Mr. Sergio Sampaio Nogueira, Head of Operations and Executive Vice President of Beef Operations for JBS's Fed Beef Business during the Conspiracy Period, when Mr. Nogueira visited the Cactus, Texas plant, which occurred regularly. Witness 1 understands that Mr. Hooker would also speak to Mr. Sergio Nogueira at other times. Mr. Hooker's contact with senior management confirms that JBS USA/Swift/Packerland senior executives maintained direct connection with plant-level managers, like Mr. Hooker, during the Conspiracy Period. Mr. Sergio

---

[11]   Mr. Guerrero worked for CMS for approximately 17 years prior to his move to JBS's Cactus Plant. He was Plant Manager for CMS's Fresno, CA plant prior to his departure in early 2012.

Nogueira was installed by Wesley Batista, JBS S.A.'s CEO,[12] and was regarded as Mr. Batista's "right hand man" in regards to JBS's U.S. beef operations. Mr. Sergio Nogueira had primary responsibility for Swift's fed cattle plant scheduling and/or operations during the Conspiracy Period.

114.    Mr. Hooker, along with Ryan Wagnon (Head of Slaughter Operations at Swift's Cactus, Texas plant) was also responsible for operations at the plant in the absence of Mr. Guerrero and the Plant Engineer,. When acting as the Cactus, Texas plant's General Manager, Mr. Hooker worked closely with beef executives from across JBS's head office. As such, Mr. Hooker regularly spoke to, and had a close working relationship with, high ranking individuals at JBS:[13]

---

[12]    Wesley Batista is one of the sons of JBS S.A. founder Jose Batista Sobrinho. Wesley Batista and his brother Joesley Batista took control of JBS S.A. in the early 2000s, prior to JBS' acquisition of Swift and Pilgrim's Pride. Wesley was CEO of JBS S.A., and directed JBS' takeover of Swift. He remained in that role, and as a director and senior executive of JBS USA, Swift and Packerland, until he was implicated in a 2017 bribery and corruption scandal in Brazil, for which he was ousted as CEO and spent time in prison.

[13]    From right to left: James Hooker - Cactus Fabrication Operations Manager; Donna Estrada – Cactus Technical Services Manager; Al Almanza – JBS Global Food Safety Director; Sergio Sampaio – JBS Corporate Director of Operations; Paul Kieker – FSIS Undersecretary USDA Operations; Dr. Hafeez – Texas USDA FLS; Dr. Mindy Brashears – FSIS Undersecretary USDA FS; Brian McFarlane – JBS Corporate Director of Technical Services; Mark DeRaad – Cactus Value Added Manager; Ryan Wagnon – JBS Slaughter Operations Manager.



115.    Mr. Hooker, Mr. Sergio Nogueira, and Mr. Wagnon, are respectively pictured on the far left, fourth from the left, and far right.

116.    On information and belief, in addition to having corporate information for JBS, Mr. Hooker had information regarding the other Operating Defendants. Mr. Hooker regularly told Witness 1 that he was in contact with his former colleagues at Tyson Fresh's Amarillo, Texas plant, including his replacement there. Mr. Hooker also told Witness 1 that he had friends and former colleagues at other Defendants' plants with whom he stayed in touch. Mr. Hooker often provided Witness 1 with detailed information regarding the current and future operations of Tyson Fresh's, CMS's, and National Beef's nearby packing plants.

### 2.    Witness 1 Learns of Defendants Unlawful Agreement

117.    During the Conspiracy Period, Witness 1 reports having multiple discussions with Mr. Hooker during which Mr. Hooker explained that all of the Operating Defendants reduced their purchase and slaughter volume in order to reduce fed cattle prices when Operating Defendants viewed fed cattle prices as being or becoming "too high" for their liking.

During one such conversation in 2015, Mr. Hooker specifically admitted that the Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

118.    According to Witness 1's account, he was in Mr. Hooker's office when Mr. Hooker received an angry phone call from his immediate supervisor, who worked out of JBS USA/Swift/Packerland's central office in Greeley, Colorado.

119.    After the call concluded, Witness 1 reports that he asked Mr. Hooker how "many are we [Swift's, Cactus plant] cutting [*i.e.* fabricating]?" Witness 1 reports that Mr. Hooker replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[14]

120.    Witness 1 also recalls asking Mr. Hooker whether Swift Cactus's competitor plants were also cutting back their kill. Witness 1 reports he recalls that Mr. Hooker answered Witness 1's question as follows: "Yes, they are. We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

121.    Witness 1 is certain that Mr. Hooker intended to convey that all Operating Defendants were reducing their slaughter volumes by agreement in response to high prices, and was not simply commenting on the fact that one or some of the Operating Defendants had independently decided to reduce slaughter.

122.    Witness 1 stated that Swift's Cactus, Texas plant had a 5,500–6,000 head per day slaughtering capacity and might drop its kill level back to around 4,800–5,200 head per day when implementing Defendants' unlawful agreement. In furtherance of the agreement, bought

---

[14]    Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities, one reason being that Slaughter Plant 1's fabrication team had to continue to process the carcasses that were already hanging in the coolers.

and slaughtered fewer cattle, which entailed running its slaughter plants at reduced hours, operating those plants at lower "chain speeds," and/or scheduling maintenance shutdowns. Witness 1 recalls management at Swift's Cactus, Texas plant, including Mr. Guerrero and Mr. Wagnon, telling staff during these periods of reduced slaughter during the Conspiracy Period that kill levels were being reduced in response to fed cattle prices.

123.   As further described below, Defendants coordinated and agreed to refrain from expanding their slaughtering and processing capacity, thereby further restricting the supply of beef.

**B.    The Available Data Corroborates Witness 1's Account**

124.   Public reports, Defendants' slaughter data, and the cattle sales data in Plaintiff's possession, indicate that all Operating Defendants reduced and rationed their slaughter volumes during the Conspiracy Period, resulting in supra-competitive beef prices. Operating Defendants also managed their respective slaughter volumes throughout the Conspiracy Period in relative lockstep in order to ensure the supply of beef remained lower than the increasing demand. Operating Defendants did so despite cattle being readily available and as Operating Defendants' margins ballooned.

125.   The slaughter reductions, while most obvious at the beginning of each year, occurred at various points throughout the Conspiracy Period. In particular, Operating Defendants collectively moderated their slaughter volume across the second and third quarters of most years in a successful attempt to expand their margins across a number of months, thereby also forestalling both the onset, and minimizing the effect of, the increase in slaughter volume that historically occurs in the fall.

126.   Operating Defendants' joint slaughter management was not a reaction to changes in beef demand, which, as admitted by Tyson Fresh's head of procurement in 2018, had

been "off the charts."[15] *See* also Figure 11 below, demonstrating rising beef demand throughout Conspiracy Period. Nor did any Operating Defendant break from the agreement and buy more cattle in an attempt to capture greater market share, despite all posting profit margins clearly demonstrating that no Operating Defendant was running at or near their marginal cost of production. From the end of the first quarter of 2015 through the end of the Conspiracy Period, Operating Defendants posted record per-head net margins. Moreover, market events and conditions do not explain Defendants' unusually high profit margins – even excluding 2019 and 2020, which saw Operating Defendants' margins increase in the aftermath of the Tyson Holcomb, Kansas plant fire and COVID disruption (discussed below), Operating Defendants average per-head margins across the Conspiracy Period for the first, second, third and fourth quarters vastly exceeded their pre-Conspiracy Period averages ($37 v. $0, $127 v. $21, $134 v. $25, $116 v. -$16, respectively).[16]

127.   Operating Defendants' rationing of the fed cattle supply among themselves in parallel throughout the Conspiracy Period is demonstrated through Figure 1 below, which records each Operating Defendant's estimated quarterly slaughter volume:

---

[15]   Tyson Fresh Meats: What the Consumer Demands – John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, November 13–15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

[16]   Per-head net margin estimates cited in the Complaint sourced from the Sterling Profit Tracker produced by Sterling Marketing Inc. and published weekly on www.drovers.com unless stated otherwise. Pre-conspiracy period average per-head margins calculated across 1997 to 2014.

**Figure 1. Operating Defendant's Quarterly Fed Cattle Slaughter Volume** [17]



128.    Figure 1 demonstrates that Tyson Fresh, Swift/Packerland, and National Beef each dramatically reduced their slaughter across 2015, while Cargill held its slaughter volumes steady following its 2014 cuts. These artificial reductions worked to cause the dramatic decline in fed cattle prices starting in 2015 and continuing throughout the Conspiracy Period, while beef prices were stabilized or increased.

129.    And while the quarterly reporting period obscures certain shorter reductions described below in Sections V. C-F, it does detail the remarkable extent to which Operating

---

[17]    Tyson, JBS and National's beef slaughter volume figures reproduced in Figure 1 were derived from Packing Defendants' (in the case of National Beef, its shareholders') financial disclosures and Cattle Buyers Weekly's record of each Defendant's fed cattle and non-fed cattle slaughter ratio to isolate the portion of their reported quarterly revenue figures attributed to beef and by-products produced from fed cattle slaughtered within the United States. Then, the volume of fed cattle (and beef) necessary to generate the disclosed revenue was determined, taking into account prevailing beef and by-product prices (as reported by USDA AMS boxed beef cutout reports and USDA drop-credit values), carcass weights, carcass grading performance (by region), and hot carcass/dressing percentages. Cargill's quarterly slaughter figures were derived by reference to Cargill's market share over time.

Defendants' quarter-to-quarter slaughter changes move in lockstep with each other. This parallelism is consistent with and the product of an agreement to jointly manage and reduce their slaughter levels below a competitive level.

130.    Figure 1 highlights the parallel reductions made by Operating Defendants in the winter/spring to constrain the seasonal rise in fed cattle prices historically experienced at this time, which had the effect of raising beef prices to a supra-competitive level. Tyson Fresh, Swift/Packerland, CMS, and National Beef each cut production at a similar time and by a similar amount:

- Q1 2015 (except Cargill whose production was flat after making significant cuts in 2014)

- Q1 2016

- Q1 2017

- Q1 2018

- Q4 2019 and Q1 2020

131.    This uniform reduction during periods of seasonally lower cattle availability is not evident in the pre-Conspiracy Period. For example, in the fourth quarter of 2012, both CMS and Swift/Packerland significantly increased their slaughter volumes (3.7% and 12.0%, respectively on a quarter-by-quarter basis), while Tyson's held its steady (0.1% increase), and National Beef engaged in notable cuts (-4.0% decline). Similarly, in Q3 2013, Tyson Fresh and National Beef increased their slaughter volumes, while Swift/Packerland and CMS reduced theirs. Across Q2 to Q4 2014, Swift/Packerland evidently sought to capture market share, first substantively increasing its slaughter volume in the second quarter (a 16.3% increase against other Defendants increases of between 4.8%-10.2%) before holding it steady across the third and fourth quarters while each other Defendant's volumes declined in those two quarters.

132.    What is not apparent from Figure 1 is the deep nature of the cuts in 2015 and 2016 when comparing the same quarter to historic production (2012–2014). In 2015, the production decreased in the year overall and each quarter. For 2016, the production decreased overall and for 3 of 4 quarters. Tyson Fresh, Swift/Packerland, CMS, and National Beef's production was down comparing year-on-year changes against an average of 2012–2014, as seen in Figure 7:

**Figure 7.**

| Year on Year Changes Against 2012 - 2014 Averages | | | | |
|---|---|---|---|---|
| **Comparison** | **Tyson Fresh** | **National** | **Swift/Packerland** | **CMS** |
| 2015 v 2012-14 | -4.8% | -13.5% | -17.9% | -11.5% |
| Q1 | -5.1% | -15.3% | -20.1% | -12.7% |
| Q2 | -7.6% | -14.7% | -17.7% | -12.7% |
| Q3 | -0.7% | -15.1% | -16.9% | -9.7% |
| Q4 | -5.8% | -8.7% | -17.1% | -10.8% |
| 2016 v 2012-14 | -2.8% | -4.4% | -14.8% | -3.7% |
| Q1 | -4.5% | -14.9% | -21.7% | -9.3% |
| Q2 | -3.7% | -9.1% | -17.9% | -6.2% |
| Q3 | -5.2% | -3.9% | -10.1% | -2.7% |
| Q4 | 2.3% | 10.9% | -10.2% | 3.3% |

133.    Operating Defendants' strategy was immediately successful, with lower slaughter volumes and lower beef output resulting in artificially high beef prices, despite cash cattle prices falling. Operating Defendants' meat margin expanded rapidly as a result.

134.    Moreover, each Operating Defendants' conduct stands apart from that of Independent Packers', who increased their annual slaughter volume in 2015 by 7.8% year-on-year.

135.    And, though Operating Defendants gradually increased their slaughter volumes over the rest of the Conspiracy Period, their rates of increase lagged far behind those of other producers, as evidenced by the following Figure 2:



**Figure 2.**
**Average Pre- and Post-Class Period Fed Cattle Slaughter –**
**Defendants vs. Smaller/Independents**



136.    Figure 3 compares the annual slaughter volumes of Operating Defendants and smaller producers before and during the Conspiracy Period and breaks out these volumes for each year of the Conspiracy Period for which data is available.  In every year, Operating Defendants slaughtered fewer cattle than they did before the Conspiracy Period.  Also shown is that, though Operating Defendants gradually increased their slaughter volumes year over year during the Conspiracy Period, their rates of increase lagged far behind other producers' rates, and far behind the rate of change that would have occurred in a competitive market.[18]

---

[18]    *See* Cattle Buyers Weekly, "Top 30 Beef Packers" Annual Reports, 2008-2019, 2018 Meat & Poultry Facts, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11 (National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume.  Absent that acquisition, its 2019 slaughter volume was flat versus 2018.  At the same time, independent packers' collective slaughter volume rose by approximately 100,000 head (net of the Iowa Premium acquisition)).



**Figure 3.**
**Average Pre- & Post-Conspiracy Period Fed Cattle Slaughter-Operating Defendants vs. Others**



137.    As shown in Figures 2 and 3 above, each Operating Defendant slaughtered significantly fewer cattle in 2015 than their pre-conspiracy period average, and then maintained artificially low slaughter levels throughout the remainder of the Conspiracy Period. That Operating Defendants each slowly raised their slaughter levels as the availability of fed cattle increased during the Conspiracy Period only reinforces the likelihood of a collective agreement to manage slaughter levels after their initial cut: Five full years later, none of the Operating Defendants have returned to their pre-2015 levels despite record profitability, while Independent Packers slaughter is up nearly 50% against their pre-Conspiracy Period average, and 25% against their 2015 levels. The result of such action gave Operating Defendants the ability to manage collective demand such that it never outpaced supply, and ensured the supply of beef stayed below demand.

## C.    Operating Defendants Slash Production in 2015

138.    The impact of the conspiracy was felt in 2015, evidenced by publicly available data. Each Operating Defendant cut its annual cattle slaughter volumes during the

Conspiracy Period by an average of about 11.3 percent compared to the pre-conspiracy period (2007-2014). In sharp contrast, other meatpackers increased their cumulative annual slaughter volumes during the same period by an average of 41.2 percent.

139.    Data breaking out slaughter volumes for each year of the Conspiracy Period highlight Operating Defendants' reductions in 2015, though other beef producers maintained or increased their volumes that same year. Despite a slight uptick in the final quarter of 2015, Tyson Fresh's overall 2015 slaughter volume was down by 4% as compared with 2014 levels, Swift/Packerland by 17 percent, and National Beef by 6 percent. CMS's 2015 production was flat compared with the prior year, but 11.3% below historical levels. All this occurred during a sustained recovery in the broader economy, as the U.S. population grew steadily, and beef demand was high.

140.    In the first quarter of 2015, Tyson Fresh, Swift/Packerland, and National Beef's year-on-year slaughter was down by approximately -1.8%, -11.2%, and -8.6%, respectively from first quarter 2014. CMS's quarterly slaughter volume was down against a 2012–2014 average and its first quarter 2015 slaughter volume, like that of its co-conspirators, was still down compared to its fourth quarter 2014 volume.

141.    These declines were reflected in the Defendants' public reporting. Tyson's May 4, 2015 10-Q noted that its "sales volume decreased [in the quarter ending March 28, 2015, year-on-year] due to a reduction in live cattle processed."[19] Jefferies Financial Group, Inc. ("Jefferies"), National Beef's then-majority shareholder, noted in its 10-Q filed May 8, 2015 that National Beef's revenues were down year-on-year for the first quarter "primarily to lower sales

---

[19]  Tyson Foods Inc. 10-Q, May 4, 2015 at 37, https://d1lge852tjjqow.cloudfront.net/CIK-0000100493/593a568a-359d-470d-b48e-3a1fe35419f7.pdf.

volume, as fewer cattle were processed."[20] JBS S.A.'s earnings presentation for the first quarter of 2015 noted a 1.1% year-on-year decline in the "number of animals processed" by its JBS USA beef unit.[21]

142.    Expanding on their respective cuts, Tyson Fresh, Swift/Packerland, CMS, and National Beef extended their joint slaughter reduction during the second and into the third quarters of 2015. Across the second quarter, Tyson Fresh, Swift/Packerland, and National Beef's year-on-year slaughter volume was down by approximately -5.4%, -12.8%, and -6.2%, respectively. CMS continued to hold to its low 2014 volume, posting an essentially flat year-on-year growth of 1.8% in the second quarter, and -12.7% against its 2012-2014 average second quarter production.

143.    Again, this reduction in cattle purchases was also reflected in Tyson Foods,[22] JBS S.A.,[23] and Jefferies (National Beef's)[24] financial reporting.

---

[20]    Jefferies 10-Q, May 8, 2015 at 57, http://ir.jefferies.com/reports-filings/sec- filings/sec-filings-details/default.aspx?FilingId=10683755.

[21]    JBS S.A., 1Q 2015 Results, May 13, 2015 at 15, https://mz- filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-                         resultadoscentral-de-downloads/ 8bc0bd99f655d7c38a18d265a7ed397678c5e9774341f1efd1c98745f1a8a360/ 1q15_earnings_ release.pdf. JBS USA Beef segment also encompasses JBS S.A.'s much smaller Australian and Canadian beef businesses and Australian sheep operations. Presentation also noted a -1.1% decline in cattle processing (both fed and non-fed) across its U.S., Australian and Canadian beef businesses. JBS USA's fed cattle to non-fed cattle slaughter ratio throughout the conspiracy period was 80% fed, 20% non-fed.

[22]    Tyson's 10-Q for its quarter ending June 27, 2015 recorded year-on-year declines in sales in its beef segment revenue due to a "reduction in live cattle processed". *See* Tyson Foods 10-Q filed August 2, 2015, p. 38. *See also* 10-K filed November 23, 2015, p. 29 (noting reduction in sales revenue in FY 2015 as against FY 2014 due to lower cattle processing).

[23]    JBS       S.A.,       2Q       2015       Results,       August       13,       2015       at       15,       https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-  resultadoscentral-de-                         downloads/02fd1b6f7f1cee632e5af617767bc7a98017ead954465d63d1e8633b2ec5a3cd/2 q15_earnings_release.pdf (noting -0.9% decline in cattle processing (both fed and non- fed) across its US, Australian and Canadian beef businesses).

[24]    Jefferies       10-Q,       August       5,       2015       at       52,       http://d18rn0p25nwr6d.cloudfront.net/CIK-0000096223/6f776d2a-f247-4868-a18b-32f9e3b4eefe.html (noting revenues for three and six month 2015 periods decreased year-on-year "primarily due to lower sales volume, as fewer cattle were processed".);

144.    Operating Defendants' determination to break cash cattle prices through their collective slaughter reductions and reduced cash cattle purchases was remarked upon by industry analysts at the time. On June 12, 2015, analyst Cassandra Fish of "The Beef" and formerly a risk manager at Tyson, speculated as to when one of the Operating Defendants might break ranks:

> Rarely has this industry segment [the beef packers,] been an all-for-one and one-for-all group. All packers need to buy cattle inventory. Most have cut hours. So will someone break ranks, pay up for cattle and add hours to capture the better realization that the next boxed beef rally will bring? Will one short a customer only to find that order filled by a competitor?[25]

145.    Ms. Fish answered her own question a few weeks later, remarking on June 25, 2015 that the "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, packers are exhibiting incredible discipline and letting the kill increase gradually," limiting the ability "of feeders to get all cattle marketed [*i.e.* sold] in a timely fashion."[26]

146.    During the remainder of 2015, Operating Defendants continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that there was an abundant supply of slaughter-ready cattle available to purchase at historically low prices, and processed beef prices remained high.[27] They did so even though it meant under-utilizing their plants, which is inconsistent with individual profitability but has the benefit of higher overall industry profitability.

---

Jefferies 10-Q, November 5, 2015 at 53 (noting the same in relation to 3Q 2015 and first three quarters of 2015).

[25] Cassandra Fish, *Futures Holding Gains; Waiting on Cash*, THE BEEF (Jun. 11, 2015), https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.

[26] Cassandra Fish, *Another Round of the Blues*, THE BEEF (Jun. 25, 2015), https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.

[27] Cassandra Fish, *Kills Too Small For Too Long*, THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

147.    On August 3, 2015, Tyson's CEO, Donnie Smith, admitted that plants were not running at full capacity, when discussing Tyson's decreased purchases over the preceding quarter, noting "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term."[28] In response to a question regarding the consequent impact of Tyson's underutilization of its plant capacity, Mr. Smith elaborated:

> In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us. It raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us. I don't know that I can quantify that right off the bat, but it does impact margin.[29]

148.    Tyson Fresh, Swift/Packerland, CMS, and National Beef's concerted actions to depress cattle prices across 2015 (and their successes) are summarized by the below chart. Figure 8 compares the price of fed cattle across 2015 against the number of fed cattle slaughtered across 2014 and 2015 at packing plants subject to AMS LMR reporting obligations.[30] These figures are a very good proxy for Tyson Fresh, Swift/Packerland, CMS, and National Beef's cumulative slaughter volume as they operate the substantial majority of such plants and appear to provide over 90% of the reported transactions. As demonstrated in Figure 8 below, the 2015 slaughter volumes are lower than 2014 in every month except February and November and lower than 2010–2014 averages in every month except October.

---

[28]    Tyson Foods, Q3 2015 Earnings Call, Seeking Alpha Transcript (Aug. 15, 2015).

[29]    *Id.*

[30]    Figure 8 was prepared using USDA Market News Service Reports: LM_CT106–National direct slaughter, committed and delivered, LM_CT151-National Weekly–Formula, Forward, Negotiated Net (Domestic), and LM_CT154–Weekly National direct slaughter, negotiated. Fed cattle prices shown in Figure 8 is the weighted average price of all four purchase categories (formula, forward, negotiated (*i.e.* cash), negotiated grid).

**Figure 8.**
**Total Fed Cattle Slaughter Volumes and Fed Cattle Prices – All Purchase Types**



### D.  Operating Defendants Continued to Artificially Limit Supply in 2016.

149.    By "ration[ing]  their new purchases [of cattle]" and running shorter 32-hour weeks in early January, Operating Defendants dampened rising cattle prices and extended the rally in beef prices.[31] Operating Defendants then further inflated beef prices by sustaining low kills across February and March.[32]

150.    Tyson Fresh, Swift/Packerland, CMS, and National Beef reduced their slaughter volumes in the first quarter of 2016: Tyson Fresh (-1.1%), CMS (-3.7%), Swift/Packerland (-16.6%), National Beef (-4.7%). Moreover, all Operating Defendants slaughtered fewer cattle than their average first quarter volume compared to 2012-2014: Tyson Fresh (-4.5%), Swift/Packerland (-21.7%), CMS (-9.3%), and National Beef (-14.9%).

---

[31]  Cassandra Fish, Global Sell Off Smacks Cattle, THE BEEF (Jan. 4, 2016), https://www.thebeefread.com/2016/01/04/global-sell-off-smacks-cattle/.

[32]  Cassandra Fish, Yet More Consolidation, THE BEEF (Jan. 6, 2016), https://www.thebeefread.com/2016/01/06/yet-more-consolidation/.

151.     Beef prices continued to increase into March 2016, despite significantly lower than expected cattle prices. By rationing the available cattle amongst themselves, Operating Defendants posted average weekly margins of approximately $63 per head, which was, at that time, one of their "best Q1 in history" and well above their pre-Conspiracy Period first quarter average of $0 per head.[33]

152.     In the second and third quarters, each Operating Defendant's kill volume remained below their 2012 to 2014 averages.

153.     Despite an increase in the availability of fed cattle, except for Cargill, each Operating Defendant's annual slaughter volume in 2016 remained below their 2014 levels (Tyson Fresh (-6%) and Swift/Packerland (-6%)) or flat (National Beef).[34] Cargill's 2016 slaughter remained significantly below the 2012-2014 average at -3.7%.

154.     The Operating Defendants' refusal to break from their collusive agreement among Defendants and co-conspirators is noteworthy given the margins Operating Defendants realized across 2016. In the third and fourth quarters alone, Operating Defendants were realizing average per-head margins on their fed cattle purchases of $123 and $153 per head, respectively. Not only were these margins significantly above pre-Conspiracy Period averages ($25 and -$16 per head), but they also exceeded the Operating Defendants' most profitable third and fourth quarters in modern times by about $30 and $100 per head, respectively. Thus, it was against Defendants' unilateral self-interest not to buy and slaughter more cattle because each Defendant could have increased its profits by doing so.

---

[33]   Cassandra Fish, This Week's Cash Trade, THE BEEF (Mar. 22, 2016), https://www.thebeefread.com/2016/03/22/sell-off-accelerates/.

[34]   2018 Meat & Poultry Facts, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11.

**E.  After Historic Cuts, Operating Defendants Continued Restraining the Supply of Beef, Resulting in Higher Beef Prices in 2017 and 2018**

155.  Going into 2017, Operating Defendants worked to ensure that any increase in their collective slaughter volumes did not outpace the growth in slaughter weight cattle availability and beef demand. Tyson, Swift/Packerland, CMS, and National Beef each reduced their volumes in lockstep during the first quarter, before raising them together across the second quarter. See Figure 1.  While cattle prices increased from $119/cwt (hundredweight) at the beginning of February 2017 to a high of $144/cwt in the first week of May 2017 (like spring highs before 2015), Defendants responded by reducing their slaughter volumes.

156.  And while cattle prices did rise from $119/cwt at the beginning of February to a high of $144/cwt in first week of May (similar to pre-Conspiracy Period spring highs), Operating Defendants responded by reducing their kills.

157.  As with 2016, Operating Defendants enjoyed substantial profits across 2017, posting then-record per-head margins in the second and third quarters ($128 and $147 per head, respectively). Indeed, Operating Defendants' average per-head margins for the first and fourth quarter, $42 and $88 per head, respectively, stood second only to the quarterly profits they generated in 2016. And again, each Operating Defendant refused to add cattle to expand their market share despite the obvious profit potential. Instead, they kept their production in lockstep with one another, rationing supply amongst themselves to ensure the continued suppression of cattle prices and resulting increase in beef prices.

158.  Operating Defendants' scheme continued into 2018. Each Operating Defendant then began to tell the market that it had, as a result of the plant closures discussed, insufficient capacity to slaughter the supposed "wall of cattle" due to reach slaughter-weight in the

spring and summer of 2018.[35] Operating Defendants then backed off their respective kill schedules during the first quarter of 2018.[36] *See* Figure 1, detailing significant decline in first quarter 2018 slaughter as against fourth quarter 2017.[37] As Ms. Fish reported, "Looking back at March's fed slaughter rate, it underperformed expectations. . . . Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable." The reduction in slaughter occurred despite record strong beef demand and Operating Defendants' underutilized capacity.

159.    Defendants' slaughter reductions occurred despite record strong beef prices and Defendants' under-utilized capacity.

160.    As a result of their commitment to limiting their purchases of cattle in 2017 and 2018, Tyson Fresh, Swift/Packerland, CMS, and National Beef's annual slaughter volumes remained 5.4-7.2%, 10.2%, 9.1% and 12.0-12.8% below their pre-2015 averages, respectively. See Figure 7. By sharp contrast, Independent Packers' slaughter volume in 2017 and 2018 increased 46.5% and 56.1%, respectively, as compared to their collective pre-2015 averages.

---

[35]    Cassandra Fish, *Still Green!?!*, THE BEEF (Mar. 27, 2018), https://www.thebeefread.com/2018/03/27/still-green/ ("The [packers'] mechanical [slaughter] capacity exceeds needs [across Q2 2018]. The limitation perception is linked to labor. The perception of there being a limitation has created fear and inspired some cattle feeders to "get in line" by selling [cattle] out-front [*i.e.*, on captive supply agreements].").

[36]    Cassandra Fish, *Futures Trade Both Sides; Cash Poised To Trade Lower*, THE BEEF (Apr. 2, 2018), https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/.

[37]    Id.

F.    **In 2019 and 2020, Operating Defendants Continued to Limit Slaughter, in Parallel, Against Their Independent Self-Interest**

161.    Entering 2019, beef demand remained "terrific", encouraging packers to run plants to meet customers' demand.[38] In a competitive environment, absent a conspiracy, Operating Defendants would compete to secure as much cattle as possible to expand profitable production.

162.    Instead, Operating Defendants continued to collude to limit slaughter volumes despite market conditions that encouraged market participants to increase, not decrease, slaughter volumes. In the first quarter of 2019, each Operating Defendant reduced their slaughter volumes, posting similar quarter-on-quarter declines: Tyson Fresh (-3.5%), National Beef (-4.0%), CMS (-3.8%), and Swift/Packerland (-4.1%). Operating Defendants each maintained comparably lighter slaughter volumes across the first three months of 2019, ensuring that their collective demand did not exceed the available supply. These supply restraints included taking downtime or reducing the number of hours the plant operated. Operating Defendants continued to constrain their weekly kill volume and declined to increase production of beef to meet rising demand, thereby artificially inflating the price of beef.[39]

163.    The resulting impact of Operating Defendants' slaughter restraint at the beginning of 2019 and their continued adherence to a common pricing strategy was that beef prices increased, despite the fact that prices for cattle continued to fall across the summer, working their way to an apparent bottom of about $109-110/cwt in the end of June. This left producers facing an

---

[38] Cassandra Fish, *How About That,* THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific. Even in February, notoriously a slow beef demand month. Packer margins are record wide for February.").

[39] *See*, *e.g.*, Cassandra Fish, *And the Beat Goes On*, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/.

average $106 per-head loss, against Operating Defendants startling estimated per-head profit of $257.[40]

164.    Despite robust beef demand, Defendants' restrained production left wholesale beef prices higher on a year-on-year basis, despite the fact fed cattle prices were flat. Ms. Fish reported beef prices were "sizzling" despite most cattle producers losing money.[41]

165.    A slight $2-3/cwt rise in prices allowed producers to realize a paltry per-head profit of about $24 by the week ending August 9, 2020, against the Operating Defendants' profit of $192 per head.

166.    Notwithstanding the predicted cash cattle strength across August, a fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019 provided an opportunity for Operating Defendants to work cattle prices lower still, sending cattle producers back into the red. Tyson closed the Holcomb plant indefinitely in the aftermath of the fire.[42] Tyson's Holcomb plant processed about 6,000 head of cattle per day and was one of seven U.S. plants capable of processing that capacity. Only Tyson's Dakota City, Nebraska, plant is larger, processing up to 7,000 head of cattle per day. The fire created a shortfall in the national packing capacity of approximately 30,000 heads per week, or approximately 6% of the total U.S. fed cattle packing capacity.

---

[40]    *Sterling Beef Profit Tracker: week ending June 21, 2019*, STERLING MARKETING INC. (June 26, 2019), https://www.drovers.com/news/industry/profit-tracker-feeding- losses-reach-triple-digits.

[41]    Cassandra Fish, *Packers Press and Cash Softens,* THE BEEF (August 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

[42]    *Over 3,800 workers at Tyson Foods beef plant in Kansas out of work after fire*, REUTERS (Aug. 11, 2019, 1:30 PM), https://www.reuters.com/article/us-tyson-foods- fire/over-3800-workers-at-tyson-foods-beef-plant-in-kansas-out-of-work-after-fire-idUSKCN1V10J1?source=content_type%3Areact%7Cfirst_level_url%3Anews%7Csection%3Amain_content%7Cbutton%3Abody_link.

167.    However, following the plant fire, Tyson Fresh, Swift/Packerland, CMS, and National Beef reduced their fed cattle bids and hiked their beef prices. These actions caused a ~$5/cwt drop in fed cattle prices and a ~$14/cwt rise in wholesale beef prices the following trading week.[43] This saw Operating Defendants' per-head margins nearly doubled from $191 to $358 in the week ending August 16. The following week, Operating Defendants' margins continued to expand, with the spread between fed cattle prices and beef values extending to a then-record high of $67.17/cwt., $39.51/cwt above the average spread for the same week across 2016-2018.

168.    In the month following the Holcomb fire, each Operating Defendant decreased its production. The parallel and coordinated decrease in production in the face of a large supply restraint cannot be explained by legitimate reasons, but instead demonstrates the commitment by the Operating Defendants to maintain high margins and keep cattle slaughter restricted. Operating Defendants' purchase and kill reductions in the aftermath of the Holcomb fire ensured that their collective supply remained constrained, giving the Operating Defendants the power to increase beef prices while paying less for the cattle.

169.    Tyson Fresh, Swift/Packerland, CMS, and National Beef consequently reaped record high margins in the weeks that followed the Holcomb fire by stepping down fed cattle prices and raising beef prices in parallel. As cattle prices bottomed out in the week ending September 13, 2019, the spread between Operating Defendants and Cattle Ranchers per-head

---

[43]    *Sterling Beef Profit Tracker: week ending August 16, 2019*, STERLING MARKETING INC. (August 20, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf. Live cattle futures contracts were also negatively impacted, with the market responding with two limit-down trading days on September 12 and 13, 2019.

margin exceeded $600, with packers making over $400 per-head while producers sustained $200 per head losses.[44]

### G.   Defendants Idled and Closed Plants, and Refrained From Expanding Processing Capacity

170.    Another anticompetitive technique by which Defendants and co-conspirators implemented their conspiracy involved a longer-term strategy to restrict beef supplies.

171.    Operating Defendants permanently closed processing facilities without replacing most of the lost capacity. These actions came on the heels of reduced production capacity already caused by a series of plant closures shortly before the Conspiracy Period, including:

   a.    On January 17, 2013, Cargill Inc. announced it would shut down its Plainview, Texas, beef-processing facility, one of Cargill's larger plants, in the following two weeks. This closure cut Cargill's slaughter capacity by 4,650 cattle per day, which was "nearly 4% of the U.S. beef industry current capacity."[45]

   b.    In April 2013, JBS USA followed suit by acquiring an inactive plant in Nampa, Idaho in order to keep it idle. JBS stated that it had "no immediate plans to reopen the facility," which would have been capable of processing about 1,100 cattle per day and, upon information and belief, remains idle today.[46]

   c.    In June 2014, National Beef closed its Brawley, California plant. This eliminated another 2,000 cattle per day of slaughter capacity.[47]

   d.    The next month, Cargill Inc. announced it would also close its Milwaukee, Wisconsin plant on August 1, 2014. This closure

---

[44]   *Sterling Beef Profit Tracker: week ending September 13, 2019*, STERLING MARKETING INC. (September 18, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker%2081919.pdf.

[45]   Apr. 3, 2013, Votorantim Equity Research Report on JBS.

[46]   *JBS USA Acquires U.S. Operations of XL Foods*, JBS April 4, 2013 Press Release, https://jbssa.com/about/news/2013/04-04/#.X-eami2ZPow .

[47]   National Beef even rejected a significant package of incentives offered by local government utilities and nearby feedlots when it decided to close its Brawley plant. "National Beef plant closing Brawley Facility," PROGRESSIVE CATTLEMEN (Mar. 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef- plantclosing-brawley-facility.

decreased the industry's slaughter capacity by another 1,300 to 1,400 cattle per day.

e. Also in 2014, Tyson Foods shut down its Cherokee, Iowa processing plant. Tyson Foods officials "told the city they would consider handing over the shuttered plant—but not to any firm that they believe is competition."[48] In 2018, Tyson Foods allowed another company to purchase the plant, but only after inserting a requirement into the deed that "limited the amount of cattle that can be processed at the plant for the next 10 years."[49]

172. Operating Defendants continued to shrink the beef industry's processing capacity when the Conspiracy Period began, doing so by idling or dispensing with plants. For example:

a. On, September 11, 2015, Cargill announced that it would sell the Plainview, Texas plant that it idled in February 2013 because it did not "make sense to reopen [the plant], especially with excess processing capacity remaining in the region."[50]

b. In August 2015, Tyson Food decreased the industry's slaughter capacity by another 2,000 cattle per day by shuttering its Denison, Iowa plant.

173. Operating Defendants slashed the industry's annual slaughter capacity by roughly two million cattle per year—excluding JBS USA's continued idling of the Nampa, Idaho plant.

174. While overall industry slaughter capacity increased slightly between 2015 and 2018, this nominal gain was primarily attributable to other, non-conspiratorial, beef-processing companies. For example, One World Beef Packing restored about 2,000 cattle per day by reopening the Brawley, California plant closed by National Beef in 2016.

---

[48] Available at https://www.desmoinesregister.com/story/money/business/2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/.

[49] Available at https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson- pork-beef-chicken-processing/1356962002/

[50] *Available at* https://www.meatpoultry.com/articles/13418-cargill-to-sell-texas-plant.

175.    In sharp contrast to the Operating Defendants' behavior, non-conspiratorial beef processing companies acted consistent with their competitive interests by increasing their capacity and output in response to reduced costs of cattle and increased prices for beef. However, their increased efforts to supply the downstream market with beef had little effect on the prices due to their small market share. Operating Defendants' market dominance and stranglehold on the industry meant that these minor incursions by the few remaining independent processors increased availability only in isolated pockets and had negligible effect on restoring supply (and thereby reducing beef prices) in most locations.[51]

### H.    Parallel Reductions in Cash Cattle Purchases and Anticompetitive Queuing Conventions

176.    Operating Defendants procure their fed cattle in three ways: (1) on the cash cattle trade market (the industry's version of the spot market); (2) through formula or forward contracts; and—for Swift/Packerland and CMS— (3) relying on their own cattle. Through the forward contracts, the producer agrees to deliver its cattle once they have reached slaughter weight at a price to be determined at the time of delivery.

177.    To increase their meat margin, Operating Defendants jointly managed their purchases of domestic fed cash cattle in parallel to purchase amounts below the available supply, including by reducing the number and volume of purchases. Operating Defendants took advantage of the supply glut of fed cattle and lower cash cattle prices to increase their meat margin. Operating Defendants expanded their meat margin by refusing to pass on the savings from the reduced cattle prices to their beef purchasers, like Plaintiff, thorough its assignors, which would normally happen

---

[51]    JBS was the only Defendant that made any capital investment to increase industry slaughter capacity during the Relevant Period.  JBS expanded its Hyrum, Utah plant in 2015 and 2016.  However, according to JBS's press releases and several industry publications, the purpose of this expansion was to increase its capacity to process culled dairy cows and not fed cattle.

in a competitive market. Instead, beef prices remained high while prices paid to cattle producers decreased, indicating a collusive agreement among Operating Defendants.

178.    In addition to Defendants reduced cash cattle purchases, each Operating Defendant employed an antiquated "queuing convention" (as described below) during the Conspiracy Period. That queuing convention served to limit producers' ability to generate price competition for their cattle.

179.    The queuing convention, which operates predominantly in relation to those cattle sold in the cash market, works as follows: once a cattle producer receives a bid from a meat packer, such as Defendants, the producer may either accept the bid or pass on it, but may not "shop" that bid to other packers, *i.e.* require competition for the bidding process. If another meat packer offers the same bid as the original bidding Packer, the producer must give the original Packer the right of first refusal.

180.    The obligation to give a right of first refusal without consideration was collectively imposed by Operating Defendants under the threat of boycott. Operating Defendants have adhered to and enforced this queuing convention for decades, including during the Conspiracy Period, and treat it as a mandatory industry custom.

181.    On information and belief, one former feedlot manager, Matt T. ("Witness 2"), confirmed that the field buyers from Tyson Fresh (Brian Alsup), Swift (Levi Canales, and prior to him, Chad Miller), CMS (Rick Vogel, and prior to him, Steve Brown), and National Beef (Richard Duffy) who visited his feedlot enforced strict adherence to this convention with threats of retaliation. In particular, each of these field buyers individually spoke to him about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.

182.     Witness 2 further reports that, when he took over management of the feedlot in 2012, the feedlot would only receive bids from National Beef and CMS. When he subsequently spoke to the field buyers from Tyson Fresh (Mr. Alsup) and Swift (Mr. Miller) responsible for his region in the fall of 2012, they both told him that they had stopped visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids. Witness 2 reports that the Tyson Fresh and Swift field buyers recommenced visiting the feedlot after he confirmed his commitment to following the queuing convention.

183.     Witness 2 also heard from the Operating Defendants' field buyers and other industry participants about other producers being "blackballed" for breaking with the queuing convention. In those circumstances, Witness 2 understood that the Operating Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted while shopping the Operating Defendant's bid, or would pressure the producer for details of its sale.

184.     As evidenced by the expanding meat margin, Operating Defendants collectively refused to pass on any savings from their anticompetitive conduct toward the cattle producers to Plaintiff, instead keeping the ill-gotten gains for themselves.

## VI.     EFFECTS OF DEFENDANTS' ANTITRUST VIOLATIONS

### A.     Defendants' Conspiracy Increased the Spread between Cattle and Beef Prices

185.     Droughts from 2011 through 2013 caused fed cattle prices to steadily increase. Predictably, wholesale prices of beef moved in tandem, maintaining a constant relationship (or margin) between the two. As a result, Operating Defendants' profits on average were trimmed to margins of only 1 to 3 percent.

186.     The DOJ has recognized that when the beef market is functioning competitively, a strong relationship exists between the supply of cattle and the price of beef charged to direct purchasers:

> [A]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits.[52]

187.     Thus, in a competitive market, lower wholesale beef prices naturally follow lower cattle prices. Once the conspiracy took hold, the spread between cattle and beef prices grew significantly. Operating Defendants' restriction of the beef supply caused cattle prices to slump, while Operating Defendants charged direct purchasers for beef at elevated prices that would not have existed in the market but for Operating Defendants' artificial supply restraints.

188.     Figure 4 is a graph constructed from published USDA data. It captures the steep climb of the spread during the Conspiracy Period, which began after a period of very minimal growth from 2012 to 2015:

---

[52]     *U.S. v. JBS*, Amended Complaint, ¶¶ 26-27.



Figure 4.

Figure 5.

| Years | Farm to Wholesale Price Spread | Proportional Increase |
|---|---|---|
| 2010 through 2014 | $34.07 | |
| 2015 through 2018 | $54.24 | 59% |
| 2019 | $84.15 | 55% |
| 2020 | $125.05 | 49% |
| | | |
| 2010 through 2014 | $34.07 | |
| 2015 through 2020 | $71.03 | 109% |

189.    According to USDA Economic Research Service data, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to present than during the preceding five years. From 2010 to 2014, the average farm-to-wholesale spread was about $34. But from 2015 to 2018, the average spread was about $54—a 59% increase. The spread continued to balloon, by 2020 reaching about $71, a 109% increase from the pre-conspiracy period average.

190.    Operating Defendants' ability to cut beef production while maintaining inflated beef prices during the Conspiracy Period provides compelling circumstantial evidence of their conspiracy. In a beef market free from collusion, if a competitor reduces its purchase of cattle, other competitors quickly pick up the slack to boost their sales and increase their market shares.

**B.      Tyson Foods and, Jointly, JBS S.A. and JBS USA Falsely Claimed Their Record Profits Were Due to Market Prescience, Not Supply Constraints**

191.     Throughout 2017 and 2018, on earnings conference calls, executives from JBS S.A. and Tyson Foods frequently attributed their historically high profits to their ability to accurately foresee the volume of cattle that would enter the beef supply chain in the upcoming years. Examples of these boasts include the following:

- On a Q3 2017 earnings call on August 7, 2017, Tyson Foods reported a beef-business operating margin of 3.7 percent for the third quarter and emphasized its confidence in the beef business going forward: "With ample supplies of cattle, we see very good conditions for our beef business as far out as 2020, as we enter the early stages of a multiyear expansion cycle. Absent a shock to the system such as a drought or an import ban, our beef business is well-positioned for profitable, long-term growth." Tyson acknowledged that it was considering raising its previously forecasted 1.5–3 percent normalized operating margins. But despite ample supply of cattle and high demand for beef, Defendants did not increase cattle purchases or cattle slaughter.

- On a Q2 2018 earnings call on May 7, 2018, Tyson Foods announced forecasted beef operating margins of 6 percent for the year—at least twice its normalized operating margin range of 1.5–3 percent. Tyson claimed the huge jump was attributable to "those cattle on feed reports and knowing that the supplies in our region are exceptionally good."

- On JBS S.A.'s Q1 2018 earnings call on May 15, 2018, JBS S.A. reported an EBITDA margin of 6.1 percent for the quarter and forecasted that the company would enjoy record beef margins for the next two quarters. JBS USA's CEO and President Andre Nogueira emphasized that its performance was not based on "taking share from anyone."

- On a Q3 2018 earnings call on August 6, 2018, Tyson Foods reported a beef operating margin of 8 percent for the quarter. Tyson Foods stated that it had an "optimistic outlook" because "we have good visibility into 2021 . . . that's good because we do see the number of animals that are out there."

- On a Q2 2018 earnings call on August 15, 2019, JBS S.A. reported a beef EBITDA margin of 10.2 percent for the quarter. JBS USA's CEO and President Andre Nogueira stated that it was "moving the overall margin in beef [to] a different level that was in the past." JBS added that it benefitted from shutting several plants in the previous five years, and that it could not see how U.S. beef could "be less profitable in 2019 compare [sic] how it is going to perform in 2018."

- On a Q4 2018 earnings call on November 13, 2018, Tyson Foods reported record beef operating margins of 8.9 percent for the quarter and 6.7 percent for the year and stated that it expected similar results in the following years thanks to visibility into cattle supply: "As we look at 2019, 2020, even in 2021 we frankly we don't see a lot of change. The supply appears to be relatively stable. We have a good sense of what that looks like just due to the calf crop that gives us good visibility for at least a couple of years."

## VII. ADDITIONAL PLUS FACTORS SUPPORTING THE REASONABLE INFERENCE OF DEFENDANTS' CONSPIRACY

192. The beef meatpacking industry contains several characteristics, which individually, or one or more in combination, make it conducive to cartelization. This plausibly supports the inference that the alleged conspiracy existed. These characteristics, or "plus factors," include: (i) the ability to signal through public communications; (ii) high producer concentration; (iii) high barriers to entry; (iv) commodity products; (v) inelastic demand; and/or (vi) opportunities to collude. Each of the beef industry plus factors were present in 2015 (if not earlier) and throughout the Conspiracy Period. These characteristics supported Operating Defendants' collusion to constrain the number of cattle entering the supply chain, reduce and restrain the volume of processed beef sold and raised, fix the wholesale price of beef, and maximize Operating Defendants' margins.

### A. Operating Defendants Signaled Their Conspiracy and Encouraged Each Other to Maintain the Conspiracy

193. One method that Operating Defendants used to coordinate, promote, and monitor their conspiracy (evident now only with the benefit of hindsight afforded by the disclosure of other now-apparent conspiratorial evidence) was to signal and discuss with each other their activities and plans during earnings calls. Examples of some communications include the following:

- During a May 2014 earnings call, JBS S.A. offered this industry forecast: "For 2015, I think beef will keep being tight. I don't see any big – an increase in beef supply in 2015."

- During a May 2014 Q4 earnings call, Tyson Foods communicated that it was striving for margin and not market share: "For FY15, we expect fed cattle supply to be down 5% to 6% from last year, and we think we've experienced the bottom of the beef supply cycle. After this year, we believe we'll see slow incremental improvement in supply. Our beef segment results should improve in the back half of the year, and while profitable for the year, FY15 results are expected to be below FY14. It is important to remember that *we'll continue to run our beef business for margin, not market share*."

- During Tyson Food's Q4 2015 earnings call, Mr. Smith further acknowledged that "You've got relatively low cattle supply, you've got too much -- well, I should not say too much, *that's probably not the right way to say it*, but you've got excess industry capacity and that limits our ability to drive margins above the 1.5% to 3%, we think."

- On Tyson Foods's August 3, 2015, Q3 earnings call, its CEO Donnie Smith admitted it was underutilizing its plants, despite hurting its margins. When discussing Tyson's decreased purchases over the preceding quarter, Smith noted that "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term." He also admitted that "industry capacity utilization [was] probably in the low 70s." In response to a question regarding the consequent impact of Tyson's underutilization of its plant capacity Mr. Smith elaborated: "In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us. It raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us. I don't know that I can quantify that right off the bat, but it does impact margin."

- On its November 12, 2015, Q3 earnings call, JBS USA's CEO Andre Nogueira de Souza publicly praised Defendants' efforts to reduce industrywide slaughter capacity through plant closures, remarking that "the reduction that we saw in the cutbacks of production in U.S. that was with the shutdown of nine plants the last two years reduced the cattle. (inaudible) cost us [$3.5 million]. I think that will be a very good position balancing the industry in 2016, 2017 and 2018."

- On a May 2016 JBS S.A. Q1 earnings call, JBS USA's CEO Mr. Nogueira de Souza described the company's supply strategy: "So I don't see any imbalance in this near future, even cattle is coming back and we're going to see a little bit more production of beef this year and next year. It's still way, way below how it was few years ago and we'll be balancing at this side because a lot of plant[sic] was shut but it's too way below our historical production level."

- On its November 2016, Q4 earnings call, Tyson Foods acknowledged the widening of the meat margin: "The dynamic is that the livestock prices have not come – they've come down faster than the retail prices have, which has allowed us to make the margins that we have right now in both beef. . . ."

**B.    The Beef Market is Highly Concentrated**

194.    Market concentration facilitates collusion. Conspiracies are easier to organize and sustain when only a few firms control a large share of the market. Practical matters, such as coordinating cartel meetings and exchanging information, and monitoring compliance are simpler with a small number of players.

195.    In this case, high market concentration coupled with Defendants' substantial collective market share in the beef market simplifies coordination because little outside competitive presence exists to undermine the cartel, and Operating Defendants can more easily monitor each other's actions related to supply and pricing.

196.    In a highly concentrated market, higher, long-term profits secured by the cartel's artificially elevated prices outweigh transitory gains in profits and market share that producers might achieve by undercutting their cartel price.

197.    The beef industry experienced significant consolidation leading up to and during the Conspiracy Period. In 2001, Tyson Foods purchased IBP, Inc., then the nation's largest beef packer. In 2002, Cargill, Inc. purchased Taylor Packing Co. In 2007 and 2008, JBS USA acquired Swift & Co. and Smithfield Beef Group, Inc., (renamed JBS Packerland, Inc. after the acquisition), the third- and fifth-largest U.S. beef packers. JBS S.A. also sought to acquire National Beef but decided to end the acquisition after a challenge by the United States Department of Justice. The DOJ publicly stated that the takeover would result in lower prices paid to cattle suppliers and higher beef prices for consumers at a time when the beef industry had become

increasingly consolidated, with a handful of companies accounting for most of the nation's beef production.

198.    Through these purchases, Operating Defendants collectively controlled about 81–85% of the cattle slaughter market during the Conspiracy Period, while the next largest meatpacker had only a 2–3% market share. Operating Defendants' control of the market enabled the conspiracy to launch no later than 2015 and prosper ever since.

**C.    The Beef Market Has High Barriers to Entry**

199.    Barriers to entry are obstacles that prevent new competitors from easily entering a market. They restrict competition in a market and make it easier for incumbents to collude.

200.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supra-competitive pricing. But where significant barriers to entry exist, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

201.    Barriers to entry have kept would-be competitors out of the beef-packing industry. The construction of a large packing plant requires an investment of approximately $300 million. For example, in the summer of 2021, Cattlemen's Heritage announced plans to build a meatpacking plant at a cost of approximately $325 million. It normally takes about two years or longer to plan and build such a facility, and the investment is not easily reversible or convertible to other uses. Moreover, new entrants must also comply with numerous regulations, recruit and train a large workforce, and develop and execute a successful marketing plan. Relative insulation from the threat of new competitors has enabled Defendants to maintain their conspiracy.

202.    These barriers have caused any potential new entrants to file for bankruptcy shortly after attempting to enter the market. These casualties include substantial enterprises, such as Northern Beef Packers, LP, and Sam Kane Beef Processing, LLC.[53] Relative insulation from the threat of new competitors has enabled Operating Defendants to maintain their conspiracy.

### D.    Beef is a Commodity Product

203.    A commodity product is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services.

204.    Markets for commodity products are susceptible to collusion. Demand for a commodity depends primarily on price, as opposed to other attributes such as product quality or customer service. As a result, cartel members can more easily monitor compliance and detect defectors.

205.    Price discrepancies for commodity products are more likely to expose defection from a conspiracy because qualitative factors such as special product features, quality, reliability, durability, and other terms of a transaction are unlikely to explain price discrepancies.

206.    Beef is a commodity product. The USDA grades beef. For example, prime beef roasts from Tyson and Cargill are virtually indistinguishable and have nearly identical nutritional content. The USDA recognizes beef as a commodity and posts daily beef prices. Options and futures for the cattle from which beef is produced are traded as commodities on the Chicago Mercantile Exchange.

---

[53]    Northern Beef Packers LP filed under Chapter 11 in July 2013 and ceased operations before selling off its assets in December of that year. "Northern Beef Packers sold to White Oak for $44.3 million," *The National Provisioner*, Dec. 9, 2013. Sam Kane Beef Processing filed under Chapter 11 in January 2019 and was acquired by STX Beef Co. in February. "Kane Beef plant sale closes, new owner pledges to restart operations," *Daily Adviser*, Mar. 1, 2019.

### E.     The Demand for Beef is Inelastic

207.     Price elasticity describes the sensitivity of suppliers or consumers to changes in the price of a good or service. Demand is inelastic if an increase in the price of a product results in only a small decline in the demand for that product.

208.     A cartel profits from raising prices above competitive levels when demand is relatively inelastic at competitive prices. An increase in price for a product with inelastic demand increases the seller's revenue, while the reduction in output lowers costs. For a product with elastic demand, increased prices would result in declining revenues, as customers purchase substitute products or decline to buy altogether.

209.     Inelastic demand is a market characteristic that facilitates anticompetitive conspiracies because it allows producers to raise their prices without lowering sales volume or triggering customer substitution to alternatives. Thus, from the standpoint of conspiring producers, inelastic demand facilitates the profitability of supply-reducing conspiracy.

210.     Beef demand is relatively insensitive to price changes. According to a recent study of beef demand, "[s]ince beef has an inelastic demand, industry total revenue increases when prices rise as there comparatively is a limited reduction in volume purchased."[54]

211.     The same study concluded that the relative impact of pork and chicken prices on beef demand is economically small. Operating Defendants' supra-competitive prices to its direct purchasers do not significantly reduce beef sales or lead purchasers to seek protein from other meat sources.

---

[54]   Glynn Tonsor, Jason Lusk, Ted Schroeder, *Assessing Beef Demand Determinants* (Jan. 18, 2018), at 7-9,                    https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf.

### F.     Defendants Had Multiple Opportunities to Collude

212.    Operating Defendants are members of industry trade associations and forums and regularly attend industry events, including the events listed below. If rivals are together at trade association meetings and exchange competitively sensitive information or agree on the production, pricing or sale of a good or service, then the antitrust laws are implicated. Further, because trade groups necessarily bring together competitors ostensibly for purposes of trade association activities, such trade groups and their activities provide cover for competitors to collude with seeming impunity. As noted earlier, discovery will be necessary to determine the full extent of Defendants' communications at or through trade association activities in furtherance of the conspiracy. However, as demonstrated below, Defendants had multiple opportunities to collude at various trade association meetings.

213.    For example, the National Cattlemen's Beef Association ("NCBA") holds an annual convention, CattleCon, during which various meetings take place.[55] The NCBA Product Council, which includes Defendants' representatives and representatives from other packers, meets quarterly for the invitation-only Beef Executive Forum. For example, two of Defendants' executives, former CMS/Cargill Vice President of Cattle Procurement Bill Thoni and former Tyson SVP of Beef Margin Management and VP of Boxed Beef Pricing Kevin Hueser, were both officers, board members, or formally designated participants of the NCBA during the Conspiracy Period. Defendants also participate in meetings of the Beef Checkoff program run by the Federation of State Beef Councils, held contemporaneously with the NCBA summer and winter meetings.

---

[55] *NCBA Allied Industry Membership*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), https://convention.ncba.org/ .

214.    The U.S. Meat Export Federation ("USMEF") is another example of a trade association at which Defendants regularly met during the Conspiracy Period. The USMEF develops export opportunities for U.S. protein producers and holds both spring and fall conferences and monthly international trade shows.[56] USMEF leadership includes current and former employees and officers of Defendants. For example, former CMS/Cargill Vice President of International Sales Pat Binger was an officer, board member, or formally designated participant of the USMEF; former Tyson Foods SVP of International Sales Roel Andriessen served as the Chair, Vice Chair, and on the Executive Committee of the USMEF; former Tyson Foods SVP of International Sales and VP International Sales Robert Shuey was a formal participant of the USMEF; National Beef International President and former Vice President of International Sales Peter Michalski served on the Export Committee of the USMEF; and former National Beef NBP International Sales President Mark Domanski served on the Export Committee of the USMEF. Also, in November 2017, Tyson's SVP of International Sales and CMS's VP of International Sales both attended the USMEF Strategic Planning Conference in Tucson, Arizona.[57]

215.    Defendants were among the founding members of the Global and U.S. Roundtables for Sustainable Beef, and they remain members. Defendants participate in its annual meetings each spring, and JBS and Cargill have leadership positions in some of the working groups.

216.    Defendants also met for multiple meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI") and its predecessor, the

---

[56]    *Events: Meetings*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/bod-meetings/; *Events: Trade Show Calendar*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/.

[57]    *USMEF Members Examine Challenges ahead, Elect New Officer Team*, U.S. MEAT EXP. FED'N (Nov. 3, 2017), https://www.usmef.org/news-statistics/member-news- archive/usmef-members-examine-challenges-ahead-elect-new-officer-team/ .

American Meat Institute. NAMI is a national trade association that represents companies that process 95% of red meat.[58] Executives and employees of Defendants also participated and held leadership positions in the NAMI. For example, CMS President of Business Operations & Supply Chain and former Cargill Beef President John Keating was an officer, board member, or formally designated participant of the NAMI; former Tyson Foods CEO, Group President of Fresh Meats & International, and COO Noel White served on the Executive Committee of the NAMI; former Tyson Foods CEO and President Thomas Hayes also served on the Executive Committee of the NAMI; National Beef President and CEO Timothy M. Klein served on the Executive Committee of the NAMI; and JBS USA CEO Andre Nogueira served on the Board of Directors of the NAMI.

217.    The NAMI and the Food Industry Association host an annual Meat Conference, which various executives and employees of Defendants attend every year.[59] In 2017, National Beef's President and CEO, Timothy Klein, Tyson Vice President of Boxed Beef Pricing Don Kieffer, JBS USA's Andre Nogueira, and CMS Vice President of Sales John Jay, amongst other Defendant executives, were listed as attendees of the Meat Conference.[60] In 2018, National Beef's Timothy Klein, JBS USA's Andre Nogueira, Cargill Vice President of Retail Beef Business Lead Elizabeth Gutschenritter, and Tyson's Don Kieffer attended the Meat Conference.[61] In 2019, JBS USA's Andre Nogueira, Tyson's Noel White, National Beef's Timothy Klein, and Cargill's

---

[58]    *See    About    NAMI*, NAT'L   AM.   MEAT   ASS'N   (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204; *Events*, NAT'L AMERICAN MEAT ASS'N (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

[59]    *Meat    Conference*, NORTH   AM.   MEAT   INST.   AND   FOOD   INDUS.   ASS'N, http://meatconference.com/ (last visited Dec. 9, 2020).

[60]    *2017 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020) https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=43A35 D00000DFE&sortBy=name.

[61]    *2018 Annual Meat Conference Attendee List as of 2.9.2018*, MEAT CONFERENCE (Feb. 9, 2018), http://meatconference.com/sites/default/files/books/2018%20AMC%20Attendee%20List. pdf.

Elizabeth Gutschenritter were listed as attendees.[62] In 2020, Tyson's Noel White and National Beef's Timothy Klein again signed up to attend the Meat Conference, along with various other Cargill and JBS executives and employees.[63]

218.    Until April 2017, NAMI sponsored an annual Meat Industry Management Conference, which offered topics such as economics and general business. That conference was then replaced by an annual Meat Industry Summit. This summit has sponsored "networking opportunities and social events," including a golf tournament, receptions, an "Issues, Answers, Actions Breakfast," the annual NAMI board meeting, and what one publication described as "closed door committee meetings to discuss policies and association business." The 2017 summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

219.    The beef industry's Annual Meat Conference, described on the event's website as "a complete education and networking experience," provides another opportunity for Defendants to confer. Many of Defendants' high-level executives have been attending this conference for years. The list of registered attendees in 2012, for example, included eight executives from JBS, Tyson Foods's then-CEO Donnie Smith, and twelve other Tyson executives.

220.    Defendants' executives and employees also attended "AgCon," a joint conference from the Commodity Futures Trading Commission and the Center for Risk

---

[62]   *Meat Conference 2019 Attendee List (as of 2/27)*, MEAT CONFERENCE (Feb. 27, 2019), http://meatconference.com/sites/default/files/books/2019-AMC-Attendee-List.pdf.

[63]   *2020 Annual Meat Conference: Registered Attendees*, FOOD INDUS. ASS'N (Dec. 9, 2020), https://www.fmi.org/forms/meeting/MeetingRosterPublic/viewRoster?meetingId=571D81000004FF&includeUnpaid=1&sortBy=title.

Management Education and Research at Kansas State University, in 2018.[64]  CMS's and Tyson's executives were listed as attendees of the 2018 AgCon, along with other Defendants' executives and employees, including Tyson Fresh's VP of Sourcing & Risk Management; Tyson Fresh's VP of Cattle Procurement; National Beef's Vice President of Cattle Procurement; National Beef's Vice President of Procurement and Risk Management; and JBS USA's Head of Risk Management.[65]

221.    Executives from Tyson, JBS, and Cargill also had ample opportunities to meet privately, particularly at the beginning of the conspiracy as a result of JBS's acquisition of Tyson and Cargill's Mexican and Brazilian chicken and U.S. pork operations, respectively. JBS S.A.'s purchase of Tyson's Brazilian and Mexican chicken operations was announced on July 28, 2014 and closed on December 1, 2014 and June 29, 2015, respectively,[66] while its purchase of Cargill's U.S. pork operations was announced on July 1, 2015 and closed on October 30, 2015. Cargill, Tyson, and JBS executives with responsibilities relating to beef and cattle, such as then-Tyson CEO and President Donnie Smith,[67] JBS USA CEO Andre Nogueira,[68] and then-Cargill Senior Vice President Todd Hall[69] were all involved in the acquisition discussions. JBS S.A.'s CEO Wesley Batista stated in July 2015 that its "courtship" with Cargill in relation to its U.S. pork

---

[64]  Inaugural AgCon brings business, government together to discuss ag futures markets, KANSAS STATE UNIV. (Mar. 8, 2018), https://www.ksre.k-state.edu/ news/stories/2018/03/AgCon2018.html.

[65]  2018 AgCon Attendees, KANSAS STATE UNIV. (Mar. 28, 2018), https://www.k-state.edu/riskmanagement/documents/Ag_Con_2018_Attendees_ Mar30.pdf.

[66]  JBS Foods Int'l B.V., Registration Statement (Form F-1) at 112 (Dec. 5, 2016), https://www.sec.gov/Archives/edgar/data/1691004/000119312516785274/d304020df1.htm.

[67]  *Tyson to sell Mexico, Brazil poultry businesses to JBS*, REUTERS (July 29, 2014, 1:32 p.m.), https://www.reuters.com/article/us-tyson-foods-results/tyson-to-sell-mexico- brazil-poultry-businesses-to-jbs-idUKKBN0FX0UR20140729.

[68]  Lawrence Aylward, *Inside the JBS, Cargill deal*, MEAT + POULTRY (July 2, 2015), https://www.meatpoultry.com/articles/13164-inside-the-jbs-cargill-deal.

[69]  Press Release, Cargill, JBS USA Pork agrees to purchase Cargill Pork business (July 1, 2015), https://www.cargill.com/news/releases/2015/NA31861255.jsp.

operations "started years ago," with discussions intensifying at the beginning of 2015, coinciding with the start of the Conspiracy Period.[70]

222.     These events afforded Defendants' top executives and other employees frequent opportunities to discuss pricing, production, and other proprietary information in furtherance of the conspiracy in an informal setting and monitor compliance with their conspiracy.

### G.     Defendants Exacerbated Their Supply Restraints by Continuing to Reduce Their Imports

223.     Defendants did not offset their slaughter reductions by importing more cattle into the United States. Rather, imports continued decreasing in 2015 and throughout the Conspiracy Period. Figure 9 captures this trend:

**Figure 9.**



---

[70]   Luciana Magalhaes, *With Cargill Purchase, Brazil's JBS Poised to Become No. 2 Pork Producer in U.S.*, WALL ST. J. (July 2, 2015, 3:18 p.m.), https://www.wsj.com/articles/with-cargill-purchase-brazils-jbs-poised-to-become-no-2- pork-producer-in-u-s-1435864508.

224.    Furthermore, certain Defendants shuttered international plants, thereby decreasing the supply of cattle available to be imported into the United States, which could otherwise have offset Operating Defendants' conspiratorial reductions.

225.    Operating Defendants' reduced domestic slaughtering and reduced cattle imports for slaughter combined to raise above competitive levels beef prices paid by Plaintiff, through its assignors.

**H.    Defendants' Market Share Stability is Indicative of a Conspiracy**

226.    In a competitive market, market shares typically fluctuate as producers compete for and gain business from each other. Relatively stable market shares over time is a "plus factor" plausibly supporting the alleged conspiracy.

227.    Although relative market-share stability in a commodity market does not itself prove collusion, it strongly suggests operation of an effective cartel that has agreed not to compete. A marked decline in market-share volatility over time may suggest a conspiracy in a previously competitive market.

228.    On information and belief, Operating Defendants' relative market shares, measured by wholesale beef sales, became more stable after 2014 and during the Conspiracy Period. The same is true for Operating Defendants' market shares as measured by slaughter capacity.

229.    Operating Defendants did not attempt to capture each other's market share or lower prices as their costs declined, as would be expected in a competitive market.

230.    As described in Section V.B., Operating Defendants reduced their output and capacity to produce beef for sale to Plaintiff, through its assignors. In a competitive market, the reduction in output by one producer typically presents an opportunity for competitors to capture market share in the face of constant or increasing demand.

231.    But instead, Operating Defendants reduced their output to limit beef supply, which increased beef prices. By acting in collusion to advance their conspiracy, Operating Defendants sacrificed potential individual gains via increased market share for larger collective gains for all via increased prices and profit at the expense of Plaintiff. Figure 10 demonstrates Operating Defendants' overwhelming dominance of the market for the purchase of fed cattle.

**Figure 10.**
**Operating Defendants' Share of Annual U.S. Fed Cattle Slaughter Volumes**



## I.      The Production Cuts Were Implemented Despite Surging Beef Demand

232.    Operating Defendants' joint slaughter management was not a reaction to changes in beef demand. Tyson Fresh's Head of Cattle Procurement, John Gerber, admitted at a November 2018 industry conference:

> "[The] [c]onsumer will pay more for beef, and have to pay more for beef because it is worth more. There is value out there in chicken and pork, but unless you have been living under a great big rock the

> last two years, you know that ***beef demand is off the charts***. We
> have a lot of supply coming at us, but we have been able to hold the
> price at a pretty good level, because of beef demand, it's been really
> good, and I think it will stay good.[71]

Significantly, no Operating Defendant broke from the group's collective, anticompetitive restraint

to buy more cattle and capture this "off the charts" demand for beef.

233.    By February 2019, beef demand was "terrific" and, in ordinary times, would

encourage packers to compete to secure more cattle and run plants to meet customers' demand.[72]

234.    This strong beef demand trend continued into the fall of 2019, where the

"voraciousness of beef demand [surprised] pretty much everyone in the business."[73]

235.    As shown in Figure 11 below, beef demand rebounded from its low in 2013.

Beef demand not only remained strong during the Conspiracy Period, but, actually, steadily

increased from its prior lows in the immediate pre-collusion period, as is also evident from Figure

11 below.

---

[71]    Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, November 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

[72]    Cassandra Fish, *How About That,* THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/ ("Rather obviously, beef demand is terrific. Even in February, notoriously a slow beef demand month. Packer margins are record wide for February.").

[73]    Cassandra Fish, *Packers Press and Cash Softens,* THE BEEF (August 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

**Figure 11. Monthly Beef Demand Indices, Jan. 1988 – Nov. 2020**



## VIII. THE BEEF INDUSTRY FACES GOVERNMENTAL INQUIRIES AND INVESTIGATIONS

236.    In August 2019, the USDA opened an investigation into the beef industry following a fire at Tyson's Holcomb, Kansas plant. The USDA took notice after the reduction in available supply simultaneously caused cattle prices to fall while elevating beef prices.

237.    On March 19, 2020, U.S. Senators Mike Rounds of South Dakota, Kevin Cramer and John Hoeven of North Dakota, and Steve Daines of Montana sent a letter to the DOJ urging the department to launch an investigation into price-fixing in the cattle market. The authors highlighted Defendants' harm to both upstream producers and downstream consumers.

238.    On a conference call reported in the press, Senator Rounds stated the request was for the DOJ "to definitively answer whether a packer oligarchy exists within the cattle market and inherently creates an anti-competitive marketplace that unfairly disadvantages the cattle producer and the consumer." Senator Rounds further commented, "These margins just don't make any sense. ***The reality is there is an inverse correlation between the producer's price and the consumer's price***."

239.    On April 8, 2020, Reuters reported that the USDA had extended its existing investigation to include the observed pricing dynamic in which Defendants paid reduced prices to

ranchers for cattle coupled with surging retail beef prices. The USDA extended its investigation in the wake of announced production shortages associated with the nationwide COVID-19 outbreak.

240.    On April 17, 2020, state-level cattle production trade associations from 23 states signed a letter to then-Attorney General William Barr requesting that the DOJ coordinate with the USDA and launch its own investigation into "fraudulent business practices within the meatpacking industry." Signatories included the Minnesota State Cattlemen's Association.

241.    The letter described the two extraordinary pricing episodes, identified by the USDA, that occurred following the Holcomb fire and during the COVID-19 outbreak. The state trade associations not only reported their own situation but also observed that: "The nature of previous and current concern in both situations is extreme market degradation to the producer segment quickly followed by sharp increases and unseasonable profitability to the packing segment through boxed beef prices."

242.    With respect to the most recent manipulations, the letter explained that: "We are now seeing that same type of price action [observed after the Holcomb fire] repeated—only in a more extreme manner and during a time of crisis that includes logistical stressors on the nation's food production and distribution system. Indeed, in the last analysis, Defendants' conduct portends more than mere profiteering. If left unchecked, it will remain a direct and gathering threat to the country's food security during the current crisis."

243.    On May 5, 2020, 11 state attorneys general, including the Montana attorney general, signed a joint letter to then-Attorney General Barr urging the DOJ to open a coordinated federal antitrust investigation into "anticompetitive practices by the meat packers in the cattle industry." This letter noted that: "Cattle ranchers . . . often struggle to survive. Consumers, moreover, do not realize the benefits from a competitive market."

244.    On June 4, 2020, Bloomberg reported that the DOJ had served civil investigative demands on Tyson Foods, JBS S.A., Cargill, Inc., and National Beef in connection with an investigation into antitrust violations consistent with the earlier requests by the producer trade associations and state attorneys general.

245.    In a letter dated May 17, 2021, sixteen members of the Senate and Congress, including Senator Daines and Congressman Matthew Rosendale, Sr. of Montana, urged Attorney General Merrick Garland to continue the DOJ investigation into the nation's four biggest meatpackers and provide Congress with updates. The letter also noted that the fire at the Tyson Holcomb, Kansas facility "created significant market disruptions."

## IX.    ANTITRUST INJURY

246.    The cattle market is an oligopsony consisting of the Operating Defendants, which purchase most of the cattle for slaughter and produce most of the beef sold in the wholesale market. When Operating Defendants colluded to restrict supply, the market effectively became a monopsony that left Plaintiff with no choice but to accept whatever price Operating Defendants offered.

247.    In a competitive market, the volume of cattle purchased by beef producers (such as Defendants) would equal the volume where supply matches the demand/marginal revenue product curve, and the price for that cattle would be the additional revenue that the producers would receive for cattle.

248.    When Operating Defendants collaborated to restrict supply, they exercised their monopsony power to compel Plaintiff to accept the price Operating Defendants offered, thus driving down the market price. In this manner, Operating Defendants' monopsony power enabled them to maximize their profit by purchasing fewer cattle at a lower price.

249.   Further, because imported beef was not offsetting the shortages that Operating Defendants created, the restricted supply of cattle caused a restricted supply of beef in the downstream market to direct purchasers like Plaintiff, through its assignors.

250.   From the standpoint of direct purchasers of commodity beef, such as Plaintiff, through its assignors, Operating Defendants function as an oligopoly in control of most of the industry supply. When Operating Defendants colluded to restrict supply, the market for beef became a monopoly in which direct purchasers were forced to buy at prices dictated by Operating Defendants who acted in concert.

251.   Because no other source was offsetting the shortages, Operating Defendants created the restricted supply of fed cattle, which, in turn, restricted the supply of beef in the downstream market to direct purchasers. Operating Defendants exacerbated this restriction through their concerted manipulation of slaughter capacity and processing volume.

252.   Because Operating Defendants had and have accompanying downstream market power, they were able to maximize their profits by colluding to produce volumes based on their marginal revenue curve instead of the market demand curve, which increased prices that Plaintiff, through its assignors, paid.

253.   Because Operating Defendants did not fear competition from other meatpackers, Operating Defendants' collusion had the dual effect of (a) artificially decreasing the price that Operating Defendants paid for cattle; and (b) artificially increasing the price they charged for their beef products.

254.   Operating Defendants' monopsony power and anticompetitive conduct had the following effects, among others:

- price competition in the beef market was restrained or eliminated;

- prices for beef sold by Operating Defendants, their divisions, subsidiaries, and affiliates, and co-conspirators, and, in turn, other beef producers, were raised, maintained, and fixed at artificially high, noncompetitive levels throughout the United States;

- direct purchasers of beef were deprived of free and open competition; and

- direct purchasers paid artificially inflated prices.

255.    The purpose of Operating Defendants' and their co-conspirators' conduct was to raise, fix, or maintain the price of beef above a competitive level. As a direct and foreseeable result, Plaintiff, through its assignors, paid supra-competitive prices for beef during the Conspiracy Period.

256.    Defendants' violations of the Sherman Act caused Plaintiff to suffer injury to its businesses or property.

257.    This harm is an antitrust injury of the type that the antitrust laws were designed to punish and prevent.

## X.    DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY

258.    Defendants took affirmative actions to fraudulently conceal their conspiracy from Plaintiff through at least the filing of the first related complaint.

259.    Defendants used various means and methods to fraudulently conceal their conspiracy from Plaintiff, including, but not limited to secret meetings, surreptitious communications between Defendants by telephone or in person meetings to prevent the existence of written records, statements to Plaintiff designed to deceive Plaintiff about the real factors involved in the prices that Plaintiff paid for beef, and not disclosing their supply-restraint agreement in communications or documents.

260.    As set forth above, Defendants engaged in secret behaviors intended to further their conspiracy. Defendants' conspiracy – based on behaviors known only to Defendants

to be unlawful at the time they performed them – plausibly  suggest that Defendants engaged in a

fraudulent concealment campaign.

261.    Defendants concealed their illegal behavior from Plaintiff by, among other

measures:

- communicating  privately by telephone  or text about their purchases and slaughter  volumes  so to avoid creating  a paper trail  as well as relying on nonpublic  forms of communication;

- offering false or pretextual explanations  for the low fed cattle prices;

- providing  pretextual  justifications  for their  plant  closures,  slaughter reductions,  and withdrawal  from the cash cattle trade;

- explicitly  and implicitly  representing that the beef bids and contract terms offered  to Plaintiff,  through  its  assignors,  was  the  product  of  honest competition  and not a conspiracy;

- misrepresenting  that  Defendants  complied  with  applicable  laws  and regulations,  including  antitrust laws; and

- misrepresenting  the nature of Defendants' agreements (and purported adherence  to competitive  safeguards)  to government  officials  and the public.

262.    During    the    Conspiracy    Period,    Defendants    also    affirmatively

misrepresented their compliance  with antitrust laws. For example:

- Tyson's Code of Conduct states that "[w]e compete in the market with integrity and comply with competition  laws [and w]e comply with the letter and spirit of competition  laws (also referred to as "antitrust"  laws) wherever we do business."

- JBS's 2014 Annual Report asserts that the company has clear policies "[t]o ensure ethical conduct and integrity in the management of its business," including  a Manual of Ethical Conduct "that addresses issues related to violations,  conflicts of interest, third-party contracts, employment practices, receiving  gifts,  decision  making,  anti-corruption  practices,  and other sensitive topics."

- Cargill stressed in its 2015 Corporate Responsibility  report that "[w]e obey the law. Obeying the law is the foundation  on which  our reputation  and

Guiding Principles are built…We conduct our business with integrity…We compete vigorously, but do so fairly and ethically. We . . . comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reaffirmed this commitment in subsequent Corporate Responsibility reports.

- National Beef's former majority shareholder, Jefferies Financial Group, acknowledged in its 2014 Annual Report that National Beef was "subject to extensive government regulations," including by the USDA.

263.   Regarding Cargill, Inc.'s, JBS S.A.'s, and Tyson Foods's conduct involving false or pretextual statements or issued false or pretextual financial data, Cargill, Inc. did so for the benefit of CMS, JBS S.A. did so for the benefit of JBS USA, Swift, and Packerland, and Tyson Foods did so for the benefit of Tyson Fresh because, had these parent Defendants not continually cloaked Operating Defendants' conspiracy, the entire conspiracy would have been unable to operate. Indeed, these parent Defendants told and perpetuated many of the lies that fueled Operating Defendants' conspiracy and allowed it to operate.

264.   In addition to Defendants' affirmatively concealing their conspiracy, Defendants' conspiracy was inherently self-concealing because it depended on secrecy for its successful operation.

265.   Defendants also misrepresented the real reasons for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade as follows:

### 1.   The Cargill Defendants

266.   As discussed above, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance their conspiracy.

267.   To facilitate Defendants' conspiracy, Cargill, Inc. made public statements offering pretextual explanations to conceal Defendants' unlawful activity. For example, Cargill, Inc. used its 2017 Annual Report to explain that "[r]enewed consumer demand for beef [produced] favorable market conditions in North America."

268.    The following year, Cargill, Inc. proclaimed that its Animal and Nutrition & Protein segment's "strong performance" in 2018 was "fueled by rising domestic and export demand for North American beef" rather than because of Defendants' anticompetitive conduct.

269.    Cargill, Inc. made these false public statements to conceal its role and participation in the conspiracy alleged in this Complaint. Instead of disclosing that its "strong performance" stemmed from the illegal behavior and tainted profits, Cargill, Inc. provided pretextual business justifications such as "favorable market conditions" and "rising domestic and export demand."

**2.    The JBS Defendants**

270.    As discussed above, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance the conspiracy.

271.    To facilitate the conspiracy, JBS USA made public statements to conceal Defendants' unlawful activity. For example, in November 2015, JBS USA CEO Andre Nogueira declared that "[c]attle price will go down" in the United States because "we are going to see more cattle available."

272.    Similarly, on an earnings call in March 2016, JBS S.A.'s founder and CEO Wesley Mendonca Batista, stated that JBS would see "better margin[s]" due to an "increase in the herd in the U.S."

273.    JBS executives made similar statements throughout 2016 and 2017 and into 2018, regularly claiming that JBS's strong financial performance in the United States was a result of "more cattle available in the U.S.," "cattle price[s being] back to the normal level," and "strong demand for beef."

274.    On earnings calls, JBS offered pretextual business justifications for its "improvement in EBITDA margin" and favorable financial projections/results, instead of disclosing that they were there result of Defendants' conspiracy.

### 3.    National Beef

275.    To facilitate the conspiracy, National Beef, through its majority shareholders Jefferies Financial Group Inc. (until 2018 when it sold a majority of its stake) and later Marfrig Global Foods S.A. ("Marfrig"), used public statements to conceal Defendants' unlawful activity.

276.    For example, in October 2015, Jefferies stated that the anticipated expansion of the cow herd "bodes well for [meatpacking industry] margins as it will lead to an increase in the number of fed cattle available for slaughter."

277.    In October 2016, Jefferies explained that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when justifying how, "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle ha[d] fallen from $1.48 to $1.16."

278.    Jefferies offered similar pretextual justifications throughout 2017 and 2018, such as "National Beef generated record results for [the last 12 months] on the back of a more balanced supply of cattle and robust end market demand," "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016," "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins," and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."

279.    These statements were made during Jefferies Investor Day presentations in 2015, 2016, and 2017, at which National Beef's CEO and President, Tim Klein, was scheduled to speak on topics related to National Beef's performance.

280.    Marfrig similarly offered false justifications for high beef prices and low cattle prices caused by the conspiracy after Marfrig acquired a controlling stake in National Beef.

281.    For example, Marfrig reported in November 2018 that, "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."

282.    In 2018, during a third-quarter company earnings call, Marfrig executives reiterated the preceding paragraph's point by claiming that "the U.S. beef industry has delivered record results" because of "an ample supply of cattle" and "strong demand in both the domestic and international markets." Although Marfrig declared that it had attained record results and better margins while reducing cattle slaughter volumes, it misrepresented that these results were due to "fewer weeks in the third quarter 2018 compared to the third quarter 2017."

283.    National Beef's CEO, Timothy M. Klein—referred to by Marfrig CEO, Eduardo de Oliveira Miron, as "CEO of [Marfrig's] North American Operations"—participated in the 2018 call.

284.    Marfrig announced in the fourth quarter of 2018 that it attained a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."

285.    Jefferies and Marfrig made these pretextual public statements on behalf of National Beef—which, as alleged above, was the original source of the pretextual public statements—to obscure their role and participation in the conspiracy. Instead of disclosing that their record results and better margins stemmed from the illegal prices implemented by the

conspiracy, Jefferies and Marfrig claimed these results were due to ample supply of cattle, higher cattle availability, and strong demand.

### 4.    The Tyson Defendants

286.    As discussed above, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance the conspiracy.

287.    To facilitate the conspiracy, Tyson Foods made public statements to conceal Defendants' unlawful activity. For example, Tyson Foods used its SEC filings from 2015 to 2018 to declare that it had "limited or no control" over the pricing and production of cattle because prices were "determined by constantly changing market forces of supply and demand."

288.    As for the factors that influence the cost of cattle, Tyson identified "weather patterns throughout the world, outbreaks of disease, the global level of supply inventories and demand for grains and other feed ingredients, as well as agricultural and energy policies of domestic and foreign governments."

289.    Tyson further stated that it "ceased operations at our Denison, Iowa plant" to "better align our overall production capacity with current cattle supplies." Tyson claimed that "[t]he beef segment earnings improved . . . due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."

290.    Rather than truthfully disclosing that the conspiracy improved its earnings, Tyson Foods issued false business justifications such as lower fed cattle costs and favorable market conditions. Tyson Foods made these misrepresentations to cover up its role and participation in the conspiracy.

291.    Defendants made these pretextual statements to mislead Plaintiff into believing Defendants were acting legally, because, by concealing their conspiracy, Defendants were able to reap supra-competitive profits.

B.       Plaintiff's Claims are Timely

292.     Plaintiff had neither actual nor constructive knowledge of Defendants' conspiracy during the time covered by the statute of limitations. Plaintiff, through its assignors, and other similarly situated direct purchasers did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the filing of the cattle ranchers class action, *In re Cattle Antitrust Litigation*, in this District on May 7, 2019. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff on inquiry notice about the existence of the conspiracy alleged in this Complaint. Throughout the Conspiracy Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff.

293.     Plaintiff only learned about Witness 1, as recently as April 7, 2019, upon the filing of cattle ranchers' Complaint. Witness 1 offers direct evidence that Defendants have been colluding to fix prices.

294.     Plaintiff did not learn and could not have learned, about the USDA and DOJ investigations into price fixing in the beef industry as early as March 12, 2020. Plaintiff did not learn and could not have learned about the USDA and DOJ investigations into price fixing in the beef industry at any time before March 12, 2020, when Secretary of Agriculture Sonny Perdue announced that the USDA had begun an investigation into suspiciously high beef prices as alleged above, and thus did not have any facts that would have reasonably put them on inquiry notice regarding the existence of the conspiracy.

295.     Before Witness 1's accounts were revealed by the cattle ranchers' complaint and the revelation of the government's investigations, Plaintiff did not have facts that existed that would have put them on reasonable notice, or inquiry notice, of the existence of Defendants' conspiracy. Accordingly, a reasonable person under the circumstances would not have been alerted

to begin investigating the legitimacy of Defendants' beef prices and conduct before these recent revelations.

296.     Further, throughout the conspiracy, Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for beef. For example, and without limitation, Plaintiff used a method of purchasing beef – including, for example and without limitation, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information – that caused it to believe in good faith that at the time that it was receiving competitive prices for beef that it purchased from Defendants and co-conspirators.

297.     Plaintiff' claims are also timely by virtue of tolling by, among other means, operation of law.

**C.     Plaintiff Exercised Due Diligence in Attempting to Discover their Claim[74]**

298.     Plaintiff could not have learned of Operating Defendants' anticompetitive conduct until recently after public disclosures regarding Witness 1 and the existence of governmental investigations. Market conditions that Operating Defendants ascribed to legal behavior did not put Plaintiff on inquiry notice.

299.     Operating Defendants' concealment was successful—that is, because of their concealment, Plaintiff was unable to discover the existence of their antitrust claim.

300.     Because of Operating Defendants' fraudulent concealment, Plaintiff had insufficient information concerning Operating Defendants' misconduct on which to base a Complaint and could not have discovered Operating Defendants' conspiracy.

301.     Defendants affirmatively made public statements giving pretextual reasons for their record profits.

---

[74]   Since due diligence is an affirmative defense, Plaintiff need not necessarily plead it here but does.

302.    Because of Defendants' misrepresentations, and Defendants' success and precision in cloaking their illegal behavior, Plaintiff lacked reasonable awareness of suspicious circumstances or storm warnings sufficient to trigger the duty to investigate.

303.    A reasonable person would not have discovered the conspiracy through any of Defendants' statements. As such, the most reasonable time for Plaintiff's duty to inquire to arise was not until after Witness 1's revelations and indication of the government's antitrust investigations became known.

## XI.    DEFENDANTS ENGAGED IN CONTINUING ANTITRUST VIOLATIONS

304.    Independent of Defendants' fraudulent concealment, which tolled the statute of limitations on Plaintiff' claims, Plaintiff' Sherman Act claims are timely because the statute of limitations period was restarted each time Defendants committed an overt act.

305.    From the start of their conspiracy, Defendants sold beef to Plaintiff at prices that were artificially raised above the competitive level, resulting from Defendants' continually renewed and adjusted unlawful agreement.

306.    Defendants' conspiratorial meetings and misrepresentations, as alleged above, were each among the new and independent overt acts in furtherance of the conspiracy that restarted the statute of limitations each time they occurred because they advanced the objectives of Defendants' conspiracy and inflicted new and accumulating injury on Plaintiff. Indeed, every statement involved different facts and suggestions yet sprang from the same seed – Defendants' conspiracy.

307.    Defendants' conduct during the conspiracy, including, without limitation, coordinating the price to pay suppliers for fed cattle and/or slaughter volumes, were each also new and independent acts in furtherance of the conspiracy that inflicted new and accumulating injury on Plaintiff.

308.    Each sale of beef by a Defendant to Plaintiff at a supra-competitive price was also a new and independent overt act in furtherance of the conspiracy and an antitrust violation that injured Plaintiff and reset the applicable statutory period.

309.    Defendants' overt acts, or one or more of them in combination, including, but not limited to those alleged above, were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts. By constantly renewing and refining their agreement (and overt acts such as those alleged in this Complaint) to reflect market conditions, Defendants inflicted new and accumulating injuries on Plaintiff.

A.    **Defendants Inflicted New and Accumulating Injury on Plaintiff**

310.    Each purchase by Plaintiff through the Conspiracy Period of Operating Defendants' beef, the price of which resulted from Operating Defendants' continually renewed and adjusted price-fixing agreement, necessarily caused new and accumulating injury to Plaintiff.

311.    As the concept of a continuing violation applies to a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years, each sale to Plaintiff, through its assignors, starts the statutory period running again regardless of Plaintiff's knowledge of the alleged illegality at much earlier times. This means that each illegally priced sale of beef to Plaintiff, through its assignors, constituted a new cause of action for purposes of the statute of limitations.

312.    Operating Defendants' conspiracy continued into the non-time-barred Conspiracy Period—that is, four years before the first cattle ranchers class action Complaint was filed and alternatively four years before the filing of the first direct purchaser class action complaint.

313.    As alleged throughout this Complaint, Operating Defendants' price fixing began in at least 2015, and many of Plaintiff's factual assertions allege Operating Defendants' 2015 misconduct. But Plaintiff also alleges that Operating Defendants' misconduct continued throughout the Conspiracy Period.

314.    Many of Operating Defendants' illegal acts occurred in 2015 and continued throughout the Conspiracy Period. *See supra* Section V.B. and Figures 1–3, 7-8 (describing Defendants' overt illegal acts beginning in 2015 and extending into the four-year period before the earlier related cattle ranchers class action Complaint was first filed and alternatively four years before the filing of the first direct purchaser class Complaint).

315.    Plaintiff alleges that Operating Defendants constantly coordinated and communicated with each other beginning in 2015 and throughout the Conspiracy Period. The fact that they maintained such communications makes plausible the allegation that their conspiracy continued from 2015 through the present. *See supra* Sections V.B. and VI.B. (describing coordination and communications among Operating Defendants in 2015 and continuing throughout the Conspiracy Period). In this manner, Operating Defendants' conspiracy continued when their sales to Plaintiff, through its assignors, were made during the four years preceding the filing of the first related cattle ranchers class action Complaint, and in the alternative, during the four years preceding the filing of the first direct purchaser class Complaint.

316.    Each of the beef industry's plus factors were present in 2015 and throughout the Conspiracy Period: high market concentration, commodity product, inelastic demand, high barriers to entry, and trade association meetings that occurred each year and provided the Operating Defendants the continual opportunity to conspire.

317.    Moreover, Defendants' conspiracy was intended to and did inflict continuing harm on Plaintiff as a result of their collective reduction and restraint on the supply of processed beef.

318.    In addition, to the extent that the Operating Defendants' conspiracy was intended to and did have the effect of reducing and restraining supply, it had a continuing effect because it takes 24 to 33 months to raise cattle for slaughter, and that does not include the processing time.

319.    Finally, this Complaint alleges that Operating Defendants sold beef directly to Plaintiff, through its assignors, during the Conspiracy Period.

## XII.    VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

320.    Plaintiff incorporates and realleges all preceding paragraphs.

321.    "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade," and "the policy unequivocally laid down by the Act is competition." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958); *see also NCAA v. Alston*, 141 S. Ct. 2141, 2144 (2021) ("In the Sherman Act, Congress tasked courts with enforcing a policy of competition on the belief that market forces 'yield the best allocation' of the Nation's resources.").

322.    "The Sherman Act adopted the term 'restraint of trade' along with its dynamic potential," which "refers not to a particular list of agreements, but to a particular economic consequence, which may be produced by quite different sorts of agreements in varying times and circumstances." *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731-32 (1988); *see also Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) ("The [Sherman] Act is comprehensive in its terms and coverage, protecting all who are made victim of the forbidden practices by whomever they may be perpetrated.").

323.     Therefore, the Sherman Act reaches any concerted scheme to affect prices. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940) (The Sherman Act covers "agreements to raise or lower prices whatever machinery for price-fixing was used."). Its target is any of the "many forms of restraint upon commercial competition" which "tend to raise prices or otherwise take from buyers or consumers the advantages which accrue to them from free competition in the market." *Apex Hosiery*, 310 U.S. 469, 495, 497 (1940).

324.     Beginning at a time yet to be determined but at least as early as 2015 and continuing in force and effect, or both, thereafter, Defendants and their co-conspirators entered and engaged in a continuing agreement, understanding, and conspiracy in unreasonable restraint of trade to artificially fix, raise, increase, and/or stabilize the wholesale price for beef sold to Plaintiff, through its assignors, in the United States at artificially elevated levels, in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

325.     The contract, combination and conspiracy among Defendants and their co-conspirators described in the immediately preceding paragraph consisted of a continuing course, pattern and practice of conduct regarding the pricing and production of fed cattle, and the sale price of beef, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

326.     Defendants' acts in furtherance of their contract, combination or conspiracy in restraint of trade described above were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

327.     The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following: (a) to fix, stabilize, maintain and/or increase the price of beef sold to Plaintiff, through its assignors, and others in the United States; (b) to allocate the volume of beef sales in

the U.S. and/or market shares of beef sales and/or purchased fed cattle; (c) to control slaughter volumes and/or beef supply in the U.S.; and/or (d) to earn supra-competitive profits on the price of beef sold to Plaintiff, through its assignors, and others in the U.S. that resulted from Defendants' collusion.

328.    In order to formulate and effect the foregoing unlawful combination and conspiracy, during the Relevant Period, Defendants and their co-conspirators engaged in one or more of the overt acts alleged above in this Complaint: (a) they agreed to exchange, and did exchange, current and/or future information concerning cattle slaughter volume, prices to purchase fed cattle, and/or the prices of beef sold to purchasers in the U.S.; (b) they agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for purchase of fed cattle and/or the sale of beef sold in the U.S.; (c) they agreed on prices, price levels, margin levels, and/or production or slaughter levels of fed cattle and/or beef sold in the U.S.; and/or (d) they agreed to fix, raise, maintain and/or stabilize, and did fix, raise, maintain and/or stabilize, the wholesale price of beef sold to Plaintiff, through its assignors, and others in the United States.

329.    Defendants and their co-conspirators entered into and refined their unlawful combination or conspiracy through, among other conduct, the overt acts detailed above.

330.    As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, during the Relevant Period: (a) price competition among Defendants and their co-conspirators in the sale of beef to Plaintiff, through its assignors, and others in the U.S. was (and continues to be) restrained, suppressed and/or eliminated; (b) prices for beef sold by Defendants, their divisions, subsidiaries, and affiliates, and their co-conspirators, to Plaintiff, through its assignors, and others, were (and continue to be) fixed, raised, stabilized, and/or maintained at artificially high, non-competitive levels throughout the United States; and/or (c) Plaintiff, through its assignors, who directly purchased beef from Defendants, their divisions,

subsidiaries, and affiliates, and co-conspirators, were (and continue to be) deprived of the benefits of free and open competition in the purchase of beef.

331.   Defendants' anticompetitive acts described in this Complaint had a direct, substantial, and foreseeable effect on interstate commerce by raising, increasing, maintaining and/or fixing beef prices throughout the United States because Defendants sell their beef in every state.

332.   The conspiratorial acts and combinations alleged above have caused (and continue to cause) unreasonable restraints in the beef market.

333.   Plaintiff has been injured in its business or property by reason of Defendants' and their co-conspirators' antitrust violations alleged in this Complaint in amounts not yet ascertained. Plaintiff's injury as a direct purchaser of beef is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants' and their co-conspirators' conduct unlawful.

334.   Plaintiff is entitled to an injunction against Defendants to prevent and restrain the violations alleged.

## XIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.   Adjudge that the conspiracy and the acts done by Defendants and their co-conspirators in furtherance thereof violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.   Enter judgment for Plaintiff against Defendants for three times the damages sustained by Plaintiff as a result of Defendants' violations of Section 1 of the Sherman Act and costs of this action, including reasonable attorneys' fees, as permitted Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

C.   Award Plaintiff prejudgment and post-judgment interest at the highest legal rate from commencement of this proceeding, to the extent allowed by law;

D.  Permanently enjoin Defendants and their co-conspirators, affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing, maintaining or renewing the conduct, conspiracy, or combination and from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect caused by any further violation of the antitrust laws; and

E.  Such other and further relief as the Court may deem just and proper under the circumstances.

## XIV.  JURY TRIAL DEMANDED

Plaintiff demands a trial by jury according to Rule 38(b) of the Federal Rules of Civil Procedure of all issues so triable.

Dated: October 4, 2024

/s/ Philip J. Iovieno
Philip J. Iovieno
Nicholas A. Gravante, Jr.
Lawrence S. Brandman
Jack G. Stern
Mark A. Singer
Justin V. Arborn
Elizabeth R. Moore
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Tel: (212) 504-6000
Fax: (212) 504-6666
E-mail: philip.iovieno@cwt.com
        nicholas.gravante@cwt.com
        lawrence.brandman@cwt.com
        jack.stern@cwt.com
        mark.singer@cwt.com
        justin.arborn@cwt.com
        elizabeth.moore@cwt.com

*Attorneys for Plaintiff McDonald's Corporation*